176 So.2d 535 (1965)
Thelma O'NEAL, Appellant and Cross-Appellee,
v.
The TRIBUNE COMPANY, a Florida Corporation, Appellee and Cross-Appellant.
No. 3523.
District Court of Appeal of Florida. Second District.
June 7, 1965.
Rehearing Denied July 9, 1965.
*537 Benjamin C. Sidwell, of Sidwell & Cheatwood, Tampa, for appellant and cross-appellee.
T. Paine Kelly, Jr., of Macfarlane, Ferguson, Allison & Kelly, Tampa, for appellee and cross-appellant.
KANNER, Judge (Ret.).
The Tribune Company, defendant, was sued by Thelma O'Neal, a widow, for libel in the publication of two news stories, one in the Tampa Times and one in the Tampa Tribune, newspapers of the company. From a verdict of $2,000 returned by the jury as actual damages and the final judgment consequent upon it, Mrs. O'Neal has instituted an appeal because of an assertedly grossly inadequate verdict. The Tribune Company is cross-appealing from the same final judgment, contending that the trial court should have rendered judgment for it through the *538 granting of either of its motions for a directed verdict upon the ground that the publications were qualifiedly privileged.
Alleging the whole articles complained of, including their headlines, hereafter quoted in full in footnotes, Mrs. O'Neal averred in her complaint, essentially, that she was owner and operator of a child's day nursery and kindergarten known as O'Neal's Northgate Nursery and Kindergarten located at her home in the northern part of Tampa; that the news articles falsely conveyed the meaning that plaintiff had beaten Cynthia Lee Marsh, the 18 months old daughter of Russell A. Marsh, who was kept by plaintiff at her nursery. Other material averments alleged identification of Mrs. O'Neal and her nursery by persons reading the articles, falsity of the news stories, and ability of the defendant to have ascertained the falsity prior to the damage; the casting of the direct charge on Mrs. O'Neal through saying that she denied punishing the child; injury to the plaintiff's health, her personal life, her profession, business, and good name; accusation by the news articles of commission of a crime by Mrs. O'Neal, that of child beating, which would subject her to ignominious disgrace, fine or punishment and which degraded her in the minds of persons who knew her and identified the nursery. Finally, retractions by the Tribune Company admitting falsity and apologizing for publishing the false and defamatory matter were alleged.
The court denied the Tribune Company's motion to dismiss the complaint, thereby holding that it stated a cause of action for libel per se. Several defenses were interposed, the court granting plaintiff's motion for summary judgment as to all except that of qualified privilege, finding that insufficient factual matters were then before it to make a determination upon that issue. Through this defense, the Tribune Company asserted that the publication of the news articles described in the complaint was made by it in good faith and in discharge of its duty and privilege to inform the public upon matters of public interest and concern, was privileged, and did not give rise to legal liability. Thus, the case was tried on the issues created on the libel charged in the complaint and the defense of qualified privilege.
Motion of the Tribune Company for a directed verdict made at the close of Mrs. O'Neal's case was denied by the court. At the conclusion of all the evidence, this motion was renewed. The court, again denying the Tribune Company's motion, granted that of Mrs. O'Neal for a directed verdict on the issue of liability.
Appealing, Mrs. O'Neal attributes the claimed grossly inadequate verdict to jury instructions concerning damages and the burden of proof and to the court's ruling with respect to proximate cause. After a careful review of the instructions, we find that, when considered in their totality, there was no prejudicial error; nor do we find error as to the ruling complained of. We shall therefore direct our attention in the ensuing portion of this opinion solely to the question of qualified privilege presented on the cross-appeal.
In denying the original motion of the Tribune Company for a directed verdict, the court said that it did not believe this type of investigation to be "within the realm of qualified privilege;" and, later, upon renewal, said, "I don't believe that on the weight of the authority and I am conscious of the fact that there is a conflict in the authority on the problems that this is a matter of qualified privilege, and I feel further that if it was a case of qualified privilege that it hasn't been fairly and accurately repoted, as a whole, and for that reason, I have to deny your motion * * *."
Where the facts and circumstances under which a communication was made are not in dispute, whether or not they are sufficient to establish that the publication was privileged is a question of law for the court. Abraham v. Baldwin, 1906, 52 Fla. 151, 42 So. 591, 10 L.R.A., N.S., 1051, 10 *539 Ann.Cas. 1148, Hartley & Parker, Inc. v. Copeland, Fla. 1951, 51 So.2d 789. In considering whether or not the publications were qualifiedly privileged, we are concerned, as to evidentiary matters, only with the offense report[1] used by the publisher as its factual source and the news articles, together with the pertinent testimony. The news story in the Times,[2] published on February 1, 1961, was headlined with a five *540 column caption at the top of the page, while the Tribune story,[3] published the next morning, February 2, was headed with a one column, three line caption.
Among the witnesses who testified were four police officers, the reporter who procured the news story for the Times, and the reporter who wrote the Tribune story. The over all effect of their testimony in its material aspects may be summarized.
Officer Cooper, author of the offense report, was in the hospital emergency room on the evening of January 31, 1961, when a Mr. and Mrs. Marsh arrived there with their infant daughter, who had sustained certain bruises. The matter was called to his attention by one of the nurses and by a county officer, a friend of the family. Officer Cooper then began an investigation in line of his official duties. He radiophoned and called in a police sergeant. Examination of the child was made, first by an interne on duty and later by a county medical examiner. Officer Cooper wrote the offense report and turned it in to his police sergeant that same evening. He designated the offense as assault on minor child; at the time, that was what it appeared to him to be. The original complaint on file at the police department was so classified. Cooper did not show the report to nor talk with any reporter; the parents did not say to him that the child had been beaten at a nursery and he made no such statement to anybody; nor did he say to any reporter that the parents said the nursery owner denied the child had been punished.
The report came to the attention of Captain Bowen and Sergeant Lawton on the morning of February 1, 1961. One of these two officers assigned the case to Detective Gore for further investigation. Typed copies of the offense report were made and one copy placed on a press board or in a press box in the lobby of the police station for use by the news media. By custom and policy of the police department, such reports were made readily available to the news media, sometimes immediately, for whatever purpose they might choose, while police reports of supplemental investigations were kept confidential and were not divulged. Police officers stated that they did not tell newspaper reporters that a child had been beaten at a nursery nor that the parents claimed it. As to the statement attributed to Sergeant Lawton in the Times article, that medical examiners verified that a child had been severely beaten, Lawton testified that he did not make the statement.
The Times and the Tribune reporters each saw the offense report on the morning of February 1 and each contacted one officer prior to publication. The reporter for the Times telephoned his story to a re-write man between 11:30 and 12:00 in time to meet a 12:00 o'clock news deadline; the Tribune reporter, who had a later deadline, wrote and turned in his story that evening. Neither made any inquiry of Mrs. O'Neal or the nursery, the parents of the child or the medical or health authorities. The Times reporter, as to the statement in the newspaper that city detectives on that day were investigating the beating of an 18 months old child which her parents *541 claimed was administered at a nursery school, did not tell the re-write man that nor that the parents claimed it; rather, he telephoned the information that city detectives were investigating a complaint of a beating of an 18 months old child. The Tribune reporter, making either a mental or a written note of the facts in the offense report, spoke with Detective Gore to verify that this was a bona fide report and the contents thereof being investigated; that officer confirmed that he was investigating an injury to a child.
From the effect of the combined testimony of the reporters and all the officers who testified, no information was given by any officer to increment or alter the factual content of the offense report; but each reporter, upon inquiry, learned from an officer that the report was bona fide and was being investigated.
No formal charge or arrest was filed or made. The ultimate determination of the matter was accidental injury. On February 18, 1961, the Tribune Company, after demand, published a retraction and apology in both the Times[4] and the Tribune[5] pursuant to section 770.02, Florida Statutes.
The ruling of the court upholding the complaint as stating a cause of action for libel per se is not questioned on this appeal. From among the established decisions, a publication is libelous per se if, when considered alone without innuendo, it tends to subject one to hatred, distrust, ridicule, contempt, or disgrace, or tends to injure one in his trade or profession, Adams v. News-Journal Corp., Fla. 1956, 84 So.2d 549; Walsh v. Miami Herald Pub. Co., Fla. 1955, 80 So.2d 669; Richard v. Gray, Fla. 1953, 62 So.2d 597; Layne v. Tribune Co., 1933, 108 Fla. 177, 146 So. 234, 86 A.L.R. 466; or if it imputes to another conduct, characteristics, or a condition incompatible with the proper exercise of his lawful business, trade, profession, or office, Miami Herald Publishing Co. v. Brautigam, Fla. App. 1961, 127 So.2d 718, cer. denied by the *542 Supreme Court of Florida, 135 So.2d 741, cer. denied by the United States Supreme Court, 369 U.S. 821, 82 S.Ct. 828, 7 L.Ed.2d 786; Hevey v. News-Journal Corporation, Fla.App. 1963, 148 So.2d 543. As to the foregoing, see Encyclopedic Digest of Florida Reports, Volume 8, Part 2, Libel and Slander, section 2, page 395. Here, the trial court granted Mrs. O'Neal's motion for a directed verdict on the issue of liability on the premise that the articles, libelous per se, entitled her to recover damages for injuries sustained to reputation, business, and health. The gist of the libel charged flows out of the injury claimed to have been suffered by Mrs. O'Neal because of the wrongful charge of beating of a child as it directly concerned her business and profession.
In the law of libel, however, there are two general classifications under which libelous publications are privileged. These are absolute and qualified or conditional privilege. A qualifiedly privileged publication, which is what we are concerned with, is a matter of differing and refined shades of meaning. Coogler v. Rhodes, 1896, 38 Fla. 240, 21 So. 109, 56 Am.St.Rep. 170. Generally, a communication which is qualifiedly privileged is one made in good faith on any subject matter in which the person communicating has an interest, or in reference to which he has a right or duty, if made to a person having a corresponding interest or duty, and if made on an occasion to properly serve such right, interest, or duty, and in a manner and under circumstances fairly warranted by the occasion and duty, right, or interest, and if not so made as to unnecessarily injure another or show express malice. Abraham v. Baldwin, supra; Shiell v. Metropolis Co., 1931, 102 Fla. 794, 136 So. 537; Abram v. Odham, Fla. 1956, 89 So.2d 334. The essential ingredients of a qualifiedly privileged publication may be enumerated as good faith, an interest to be upheld, a statement limited in its scope to this purpose, a proper occasion, and publication in a proper manner. Abraham v. Baldwin, supra. Otherwise stated, in determining whether or not a communication is privileged, the nature of the subject, the right, duty, or interest of the parties, the time, place, and circumstances of the occasion, and the manner, character, and extent of the communication should all be considered. As to the above, see also 20 Fla.Jur., Libel and Slander, section 61, pages 581-582. Ordinarily, the defense of qualified privilege is an affirmative one, Abraham v. Baldwin, supra; 53 C.J.S. Libel and Slander § 178, page 280; 33 Am.Jur., section 248, page 230; and has been characterized as being in its nature a plea of confession and avoidance, 53 C.J.S. Libel and Slander § 178, page 281; 33 Am.Jur., section 248, page 230. Here, both parties are in agreement that the question involved was one of law for the court.
It is the position of the Tribune Company that, in publishing the news articles, it presented only the factual content of the offense report, that neither the name of Mrs. O'Neal nor that of her nursery was used, that no reference was made to the place of the alleged offense, and that its publications were made fairly, accurately, without malice, and without imputing blame or guilt to anyone. It asserts that it had a right and duty to publish, in the public interest, the contents of an official police report of the city police department as to investigation of an alleged crime, that the defense of qualified privilege under these circumstances was available to it as a matter of law, and that the court should have rendered judgment for it through the granting of either of its motions for a directed verdict. Mrs. O'Neal urges that the news stories were based upon the offense report of the police which, being a preliminary report, authorized no qualified privilege. She states further that the articles were published by the Tribune Company without investigation beyond the hearsay communications to police. This, she says, exhibited carelessness on the part of the Tribune Company and constituted a lack of good faith essential to a claim of qualified privilege. She insists, moreover, that there *543 was no protection because of excessiveness, unfairness, and inaccuracy of the publications.
In considering the problem before us under the positions of the parties, we have probed many cases from various jurisdictions, with particular view to the circumstances and reasons under which the courts either granted or denied the protection of qualified privilege. We present certain of the decisions, beginning with cases wherein the courts granted the protection.
McClure v. Review Pub. Co., 1905, 38 Wash. 160, 80 P. 303, contained quotation of articles which set out information gained by reporters from the police connecting plaintiff with an alleged burglary, her arrest and subsequent release because of mistaken identity, and the arrest of another woman identified as the person really wanted. The Washington supreme court upheld the demurrer to the complaint sustained by the lower court because it alleged mere excerpts or disconnected extracts of the news articles. Commenting upon the law of libel, the court stated that nothing in the articles could be construed as imputing to the plaintiff the commission of the crime but that it only purported to be a statement of the acts and theories and representations of the officers of the law in relation to the pursuit, arrest, trial, and acquittal of the plaintiff, adding that the libelous character of the articles could not be established when construed as a whole and that the articles were undoubtedly qualifiedly privileged.
The libel suit in Morasca v. Item Co., 1910, 126 La. 426, 52 So. 565, 30 L.R.A.N.S. 315, revolved about two news stories published by the defendant, the first stating that it was believed certain persons had been poisoned by sugar bought from a grocery store at Sixth and Rampart, the second telling of the death of a child, mentioning the grocery store of Benedetto Morasca, and stating in part, "`It is the opinion of Coroner O'Hara that the child died from tartar emetic poisoning. He thinks that some of this substance, which is used in the composition of ant poison, may have accidentally gotten in the sugar at the grocery.'" It eventuated that the child had died from poison, not, however, bought from plaintiff. No charges were ever filed against anyone and nobody was arrested. The defendant, pleading qualified privilege, offered in evidence the report of a police sergeant filed in accordance with the rule of the police department, setting out that certain persons claimed they had been attended by doctors who said their sickness was caused by sugar and that the officer procured a sample from the grocery of Morasca where the sugar was bought by the sick family. The court observed there was no intimation that one person had attempted to poison others; plaintiff was not defamed, for his name was not connected with any wrongful act; the question of privilege vel non did not arise, as there was no libel committed at any time nor by any one. Defendant through its police reporter took up the report and made it known, without using large and sensational headlines; it mentioned that there was an investigation on foot; it sought to set forth the facts. Reference to the steps taken was held not actionable.
Kilgore v. Koen, 1930, 133 Ore. 1, 288 P. 192, is a case wherein the defendant newspaper had published articles, based on reports of sheriff's deputies, giving details connected with the arrest of the plaintiff for stealing a harness, his arraignment before a justice of the peace, and the fixing of bail, which he furnished. The plaintiff made no claim based upon publication of the matter in connection with the stealing of the harness. What he contended was that the defendant had no right to publish, in the course of its narrative, a matter in regard to the stealing of chickens. The court, however, said that the newspaper did not accuse the plaintiff of stealing chickens but merely stated that the officers, because of a statement made to them in regard to the chickens, suspected plaintiff of the harness burglary. Finding no error in the *544 trial court's granting of judgment of non-suit for the defendant, the court stated, "We quote from the note to Flanagan v. Nicholson Publishing Company, 137 La. 588, 68 So. 964, L.R.A. 1917E, 510, Ann.Cas. 1917B, 402, 424, as follows: `It is within the qualified privilege of a newspaper to publish in good faith as current news all such matters as involve open violation of law or public misconduct such as justifies police interference, and matters in connection with and in aid of the prosecution of inquiries regarding the commission of a crime, even though the publication may reflect on the actors and tend to bring them into public disgrace or contempt.'" The court thereupon considered the questions of malice and inaccuracy, commenting that in the articles there was no opinion or intimation expressed by the defendant imputing a crime to plaintiff or expressing any opinion as to his guilt or innocence. The finding was that, when construed as a whole and not by parts selected by plaintiff as alleged in his complaint, the articles were not libelous per se and were prima facie qualifiedly privileged, with no showing of malice. Said the court, "The public was entitled to know through the newspaper whether there were reasonable circumstances connected with the matter upon which to base the proceedings and arrest the defendant. * * * [T]he sheriff and his deputies had the right to detail the circumstances, and their theories based upon the circumstances, in regard to the arrest, and it was proper for the newspaper to publish the same. The matter was connected with the case and germane to the preliminary arrest."
Another case which we think should be included in our summary is that of Broking v. Phoenix Newspapers, 1953, 76 Ariz. 334, 264 P.2d 413, 39 A.L.R.2d 1382, wherein the publications, although not based upon a police report or investigation, adverted to a search being conducted by the humane officers for plaintiff with view to prosecuting him for a deed which, in that jurisdiction, was a crime. There was no charge and arrest. The articles, libelous per se, were held by the court to be conditionally privileged, the court finding that the publication was of public interest communicated by one whose right it was to inform the public of the matter, if true, and finding also that the plaintiff had proved neither falsity nor malice.
The more recent case of Stice v. Beacon Newspaper Corp., 1959, 185 Kan. 61, 340 P.2d 396, 76 A.L.R.2d 687, concerned stories implicating the plaintiff, who was an attorney and judge, in a burglary ring, based upon an investigation by and reports of police officers and the police department and the later additional reports of the attorney general with respect to the police department's investigation. There was no official charge against nor arrest of the plaintiff. The articles about which he most vigorously objected were certain news stories based upon interviews with police officials and reports of the police department. The court found that the articles indicated there were open violations of law justifying police interference and concerned matters in connection with and in aid of prosecution of inquiries regarding the commission of crime and held the articles qualifiedly privileged. As we have pointed out, the case also involved statements and acts of the attorney general. The court cited Beyl v. Capper Publications, Inc., 1957, 180 Kan. 525, 305 P.2d 817, a case from that jurisdiction wherein the publication was based on an interview by the newspaper with the attorney general in connection with investigation of a burglary ring and information given by him, as to which the Kansas court held the publication qualifiedly privileged.
We turn now to cases which we deem illustrative of instances in which the courts rejected the defense of qualified privilege as to the particular publications before them under the varying circumstances reflected.
In the early case of McAllister v. Detroit Free Press Co., 1889, 76 Mich. 338, 43 N.W. 431, 15 Am.St.Rep. 318, the plaintiff and his companion were arrested under a complaint *545 charging them with illegal sale of stamps, detained in jail for a few days, and then released upon withdrawal of the complaint against them. The defendant newspaper published two articles, the first setting out details of the incident after recalling first that there had been a recent safe cracking which involved stealing of stamps. The second article stated that the men arrested for trying to dispose of stamps at half price had been released, as there was no evidence that they were the men wanted in the city where the robbery had occurred. There was no complaint against the men for the latter offense, but only for illegal sale of stamps. Sued for libel, the defendant pleaded qualified privilege, urging that its publication was a true and correct account of the felony involving the stealing of stamps and of the arrest of plaintiff and his companion by a police officer on his suspicion that they were guilty of the felony and that the publication in that sense was a true and correct statement of the facts. The court commented that the reporter contented himself with the statement of a patrolman on the streets and that the only thing he saw with his own eyes was the complaint, which was only for a misdemeanor, not a felony such as the publication was looking toward. The judgment for the defendant was reversed and the cause remanded for trial upon the issue of damages. Emphasizing the reporter's lack of care, the court said, "* * * [T]he reporter of a newspaper has no more right to collect the stories on the street, or even to gather information from policemen or magistrates out of court, about a citizen, and to his detriment, and publish such stories and information as facts in a newspaper, than has a person not connected with a newspaper to whisper from ear to ear the gossip and scandal of the street. If true, such publication or such speaking may be privileged, but, if false, the newspaper as well as the citizen must be responsible to any one who is wronged and damaged thereby." The court stated that had the reporter contented himself with saying that the men had been arrested, a complaint made against them for selling stamps without a license, and that certain facts led the chief of police to think they might be connected with the robbery of stamps and was holding them to await developments, the publication might have been privileged, although not true.
In the case of Billet v. Times Democrat Pub. Co., 1902, 107 La. 751, 32 So. 17, 58 L.R.A. 62, the news article was based upon police investigation records and contained statements with respect to the plaintiff's guilt of an alleged theft of money from a safe in a dwelling wherein he resided. There was no arrest nor filing of a charge. As it turned out, there had been no theft, but during the course of the police investigation, it was discovered that the missing money had been misplaced. As to privilege, the court said there would have been none even if the defendant had confined itself to the publication of the reports as made by the corporal of the police and the detectives and as entered upon the books kept by the superintendent of the police or the chief of detectives for that purpose, since neither common convenience nor the interests of society required that the opinions, suspicions, and deductions of police and detective officers, whether reported in writing to their superior officers or through the telephone to the newspapers should be published to the world. The court added that such reports are in no sense judicial proceedings and that their publication was entitled to no greater privilege than that of reports emanating from private individuals.
In Burrows v. Pulitzer Pub. Co., 1923 Mo. App., 255 S.W. 925, although there was a written police report, the news article of the defendant was based upon a telephone conversation with a police reporter who, in turn, received the information from the desk sergeant at a police station. The plaintiff, with two boys, was implicated by the news article in connection with disappearance of a sum of money. Later, one of the boys confessed, returned the money, was released, and was not prosecuted; and the plaintiff was exonerated of any connection with disappearance of the funds *546 There was a certain order of arrest, but no proceeding beyond the above stated events appears to have transpired. The court said that from the news article, the ordinary and reasonable mind could strongly infer and conclude that the plaintiff was charged with participating in the theft, while there was nothing in the police report to induce the ordinary and reasonable mind to connect the plaintiff with the larceny. The court found the publication to be not a true, fair, and impartial relation of the police report and so not privileged. The information used, by the court's evaluation, based upon the conversation, did not rise to the dignity of a police report and could not be relied upon as such, since it "bore the earmarks of non-reliability." The court, in view of its holding, found it unnecessary to pass on the privileged right to publish a fair and impartial police report, except to say that it was inclined to the views expressed in Arnold v. Sayings Co., 1897, 76 Mo. App. 159. There, the court held that a letter and postal from the chief of police of one city to the chief of police of another was not a statement of fact developed on a judicial investigation or resulting from a judicial investigation nor matters about which the public had a right to be informed nor information useful to the public and so was not privileged.
The case of Lancour v. Herald Globe Ass'n, 1941, 111 Vt. 371, 17 A.2d 253, 132 A.L.R. 486, concerned news stories stating that the plaintiff and his brother had been arrested and would be tried on a charge of robbery, based on false statements made by the brother in his confession as related to the reporter by a detective who had taken part in the interrogation. He was later discharged by the court for lack of evidence after arrest and arraignment in the municipal court and the fixing of bail, which he was unable to furnish. The ensuing libel suit was resolved by the jury in favor of the defendant. Both parties regarded the question of qualified privilege as being answerable in application of the rules of law pertaining to the publication of newspaper account of judicial proceedings. In addition to the fact of the arrest and charge upon which it was made, the defendant had published the statement which falsely and unequivocally accused the plaintiff of complicity in a felony. The Vermont court stated, "* * * [W]e do not regard a preliminary police investigation as a judicial proceeding or the publication of a statement made in the course thereof by the self-confessed perpetrator of a crime concerning an alleged accomplice as within the protection of a qualified privilege. Information of this nature given out by the police is not to be considered as a statement of facts developed on a judicial investigation or the statement of a fact resulting from a judicial investigation." The court held that there was error in submission of the question of privilege to the jury, and the cause was remanded for trial upon the issue of damages only. See also statement in the annotation, page 496, under heading, "Police investigation as within rule of privilege relative to report of judicial proceedings. (Libel and Slander, section 100.)"
It may be noted that two of the above cases are from the Louisiana jurisdiction, Billet v. Times Democrat Pub. Co. and Morasca v. Item Co. The court in Morasca found the earlier case distinguishable and not pertinent because of certain divergent features. A difference, among the others, which we observe is that the court in Billet rejected as privileged a report of the suspicions, opinions, and deductions of police in their investigations, since not required by the interests of society and since not a judicial proceeding, while in Morasca the court, stating that the newspaper through its reporter took up the police report, made it known, and sought to set forth the facts, characterized as not actionable the reference to the steps taken.
We have found no case substantially analogous in its facts and circumstances to the one at bar, and there is no statutory authority in this jurisdiction *547 that affords any prescription or guide. From the amalgam of the cases to which we have directed our study, we conclude that, where the public interest is concerned, it is within the conditional privilege of a newspaper to publish in good faith, as current news, matters which involve open violations of law or public misconduct which justifies police interference, and matters in connection with and in aid of the prosecution of inquiries regarding the commission of a crime, even though the publication may reflect on the actors and tend to bring them into public disgrace or contempt. However, it is necessary that the statement not go further than a mere report of the news by making charges directly or by inference, insinuation, or assumption, that one is guilty of a crime; and it cannot go beyond a mere narration of the transaction recounted by making untrue and injurious reflections on the private or business character of a party to the transaction. 33 Am.Jur., Libel and Slander, Comments on Matters of Public Interest, section 167, Crime and Criminal Charges, page 161. It may be said, too, that a newspaper has no protection through qualified privilege in its publication as news of any false and harmful statement founded on opinion, suspicion, or speculation. By common knowledge, however, newspapers daily impart in their news columns factual information relating to matters which are in the public interest, and the source material used is often identified as the police department or police officials. The statement in 33 Am.Jur., section 167, is classified by that authority as a separate category, distinct from those relating to legislative, judicial, other proceedings, and classifications set out elsewhere pertaining to qualified privilege. It may also be recalled that certain of the cases which we have mentioned support the statement. It should be emphasized that the qualified privilege above described means publication of matter concerning which the public has a right to be informed. The subjects comprehended are open violations of law, public misconduct justifying police interference, and matters in connection with and in aid of prosecution of inquiries regarding the commission of a crime. Where conditional immunity is sought, each case must stand on its own peculiar facts and circumstances.
A publication which is in disregard of the restraints and qualifications imposed on the publicity to be given such publications is not privileged. Abraham v. Baldwin, supra; 20 Fla.Jur., section 62, pages 583-584. Thus, if any requisite is lacking, no protection by qualified privilege is available. A prescription common to all classifications of the rule of qualified privilege is the basic requirement of fairness and accuracy.
In capsule, the Tribune Company's contention is that a newspaper may publish the contents of an official offense report of a city police department made during the course of investigation of an alleged crime as a matter of qualified privilege if no mention is made of any suspect and if the publication contains no implication of guilt on the part of anyone. Recognizing that its news articles were required to have been fair and accurate, the Tribune Company says that these essentials were fulfilled and demonstrates this by stating that the publications named neither Mrs. O'Neal nor the nursery; further, that its use of the word "beating" and the like are reasonably accurate under the language used in the offense report.
Although it is true that the news articles did not designate Mrs. O'Neal by name, address, nor nomenclature of her nursery school, accompanying the charge was full identification of the child and her parents by the giving of their names and address; and references made in the two news stories were "Beaten at Nursery," "administered at a nursery school," "the operator of the nursery," "she denied," "administered at a local day nursery," and "the day nursery owner denied." Through her complaint, Mrs. O'Neal alleged that *548 there was the intention "to convey the meaning that plaintiff had beaten said child and was understood to so mean by persons who knew the plaintiff, and by the parents of other children who are kept at plaintiff's nursery, * * *." The evidence is clear and undisputed that several witnesses who received no information prior to reading one or both of the news stories, some of whom were patrons of the nursery, knew from the address and names of the child and her parents that the articles concerned Mrs. O'Neal and her nursery. It is not essential that the person defamed be named in the publication if, by intrinsic reference, the allusion is apparent, or if the publication contains matters of description or reference to facts and circumstances from which others may understand that he is the person referred to, or if he is pointed out by extraneous circumstances so that persons knowing him can and do understand that he is the person referred to; and it is sufficient if those who know the plaintiff can make out that he is the person meant. 33 Am.Jur., Libel and Slander, section 89, page 102; and for numerous jurisdictions holding to this effect, see 91 A.L.R. 1161, 1163.
In considering the meaning or effect of a publication, the whole context must be looked to; and the language must not be interpreted by extremes but should be construed as the common mind would naturally understand it. Walsh v. Miami Herald Pub. Co., supra. Both the headline and the item to which it is attached are to be considered as one document. 33 Am.Jur., sections 87 and 88, pages 100, 101. The significance lies, therefore, not within the import of any particular word or words used in a publication but within the over all effect of the language. We stress the fact that the critical consideration is the imputation of the particular charge against a nursery and its owner, that of the beating of a child. This is the heart of the case, the ingredient without which there would have been no case. This charge is laid in the complaint and is the gist of the action; and, as we have pointed out, the sufficiency of the complaint is not challenged here.
Looking at the whole offense report upon which the Tribune Company relies, one readily sees that its author designated no one as being charged or suspected and mentioned no claim or complaint as having been registered against any person, whether by the parents, the police, or anyone else. Turning then to the news stories, one sees that each of them, construed as a whole with its headline, set out a charge of child beating at a nursery school and the owner's denial. The retractions themselves acknowledge this. In the Times' story alone, the banner headline across five columns at the top of the page, "Parents Say Child, 18-Months-Old, Beaten at Nursery," was followed with the reporter's byline, then with a lead paragraph stating, "City detectives today were investigating the beating of an 18-months-old child, which her parents claim was administered at a nursery school." The account, among other things, went on to state, after giving the names and address of the child and her parents, that Detective Sergeant Lawton said medical examiners verified that the child had been severely beaten, while police were said to have been told by the parents that they telephoned the operator of the nursery and that she denied the child had been punished. The headline thus announced the charge by the parents; the reporter's byline distinguished the story and its author; the lead paragraph affirmed the claim announced, posing the charge as the focal point or nucleus of the transaction; the direct claim by the parents conveyed verity; the statement untruthfully attributed to Sergeant Lawton as to medical examiners' verification, which followed closely upon the charge, indicated official authentication via that officer to the newspaper; the further text was tied in with the charge, which was cast upon Mrs. O'Neal through the denial. There is a great difference in saying that someone has been beaten and imputing *549 a charge that someone has done the beating. The Times reporter did not say in his telephone account that the child's parents claimed she had been beaten at a nursery; rather, by his testimony, he presumed that this came from the mind of the man who wrote the story, or the Tribune Company's re-write man; what he said was that police were investigating a complaint of a beating of a child. The Tribune reporter, making either a mental or a written note of the facts of the offense report so he could check later in the afternoon with detectives, learned from a police officer that the offense report was bona fide and was being investigated.
As we have pointed out, the evidence, under the qualified or conditional immunity of a newspaper characterized in the statement which we have previously set out, indisputably connected Mrs. O'Neal with the charge which the news articles imputed. Recognizing that there is a divergence of views among the courts of various jurisdictions, we think, however, that, based upon the public interest, newspapers can be conditionally protected in publishing accurately, fairly, and without malice as current news factual accounts under the statement of principle delineated; and we align ourselves with those jurisdictions which foster this view. Here, the news articles were not qualifiedly privileged because it is clear from the undisputed facts that they did not conform to the important requirements of fairness and accuracy. Having found initially that the trial court committed no harmful error under the points raised by Mrs. O'Neal on her appeal, we affirm the judgment of the court below.
Affirmed.
SHANNON, Acting C.J., concurs.
McNATT, JOHN M., Associate Judge, dissents with opinion.
McNATT, JOHN M., Associate Judge (dissenting).
My interpretation of the decisions compel me to disagree with the holding of the majority that "the news articles were not qualifiedly privileged" and that the appellant is entitled to damages.
Many years ago the Supreme Court of Florida approved the proposition that "Where a person is so situated that it becomes right, in the interests of society, that he should tell to third persons certain facts, then, if he bona fide, and without malice, does tell them, it is a privileged communication," and if the matter so published "should turn out to be untrue" such does not render the publisher liable. Coogler v. Rhodes, 1897, 38 Fla. 240, 21 So. 109. And while a newspaper has "no more right than a private individual to trifle with the reputation of any citizen," Layne v. Tribune Co., 108 Fla. 177, 146 So. 234, yet under the "qualified privilege" rule a newspaper may publish fair and accurate accounts of matters of publish interest. Abram v. Odham, Fla., 89 So.2d 334.
Unquestionably, brutality, crime and morals are of public interest and public concern. Therefore, if they act in good faith and without malice, newspapers and other news media may publish as news items matters contained in the reports of officials charged with the preservation of law and order in the community, and will not be liable for damages if the publication "turns out to be untrue." Beyl v. Capper Publications, Inc., 180 Kan. 525, 305 P.2d 817; Tilles v. Pulitzer Pub. Co., 241 Mo. 609, 145 S.W. 1143; Kilgore v. Koen, 133 Ore. 1, 288 P. 192; McClure v. Review Pub. Co., 38 Wash. 160, 80 P. 303; Broking v. Phoenix Newspapers, 76 Ariz. 334, 264 P.2d 413; Morasca v. Item Co., 126 La. 426, 52 So. 565; 33 Am.Jur. 161.
The parties agree that the facts respecting the defense of "qualified privilege" were not in dispute and presented a matter of law to be passed upon by the trial judge. *550 It is my view that the defense was completely sustained by the facts, and that appellee's motion for directed verdict should have been granted and judgment entered for it.
NOTES
[1] Details of Offense

(State fully all circumstances of this Offense and its investigation)
Met Mr. & Mrs. Russel A. Marsh, parents of Cynthia Lee Marsh, age 18 months, at Tampa General Hospital E.R.
Mr. Marsh stated he had placed his daughter in the O'Neal's Nursery at 8918 Ashley St. at 0700 hrs. this date. He picked the child up at 1730 hrs. this date and took her home where he found bruises on her buttocks and right leg. He stated he called the nursery to find out if the child had been punished and was advised by Mrs. Charles O'Neal that she had not.
He brought the child to T.G.H.E.R. where she was examined by Dr. D. Ritt, of 309 Como, Tele. 84-7531, who stated he could not offer a professional opinion, but was of the opinion that the bruises were not caused by an ordinary spanking with the hand.
The Medical Examiner, Dr. J.B. Hutcheson of 1 Davis Blvd., Tele. 66-2861, was called to examine the child he stated the bruises were caused by a paddle or some facsimle (sic) and that one place on her left buttock about one inch square was not bruised indicating that the instrument used might have had a square hole in it. He also indicated that the bruises were of such a nature that they could not have been inflicted by an oridinary (sic) punishment and that they were apparently inflicted on the bare skin.
Cynthia had been wearing training pants, plastic pants, and corduroy trousers while at the nursery.
Dr. Hutcheson also took a vaginal specimen for possible semen of which results were not available at time of this report. Dr. Hutcheson recommended that pictures be taken of the child's buttocks at this time and twenty-four hours later and forty-eighty (sic) hours later to show progress of the injuries.
A picture was taken of the child's buttocks by Mr. Ogletree at the P.D. and the parents were instructed to bring the child back for more photos at 2130 1 Feb. 61 and 2 Feb. 61.
Juvenile report made. Sgt. Jones on hand and supervised.
 to 2245 hrs.
 James Cooper
 Zone 14 Pla. B.
es
(Note: the following is the reverse side of the offense report as filled in.)
OFFENSE REPORT Police Department CITY OF TAMPA
Complainant Cynthia Lee Marsh w/f 18 Mo. Offense No. 1-1882 Address 1808 Bouganvilla Phone No. WE 4-8883 Offens Assault on Minor Child  Age 18 Mo. Location of Offense O'Neal's Nursery, 8918 Ashley Date Offense Committed 31 January 1961 Time XXXX-XXXX hrs. M Officers Assigned Det. Div. Arrests
_______ Date ____ Remarks:
 cc:dd

[2] DETECTIVES INVESTIGATING
PARENTS SAY CHILD, 18-MONTHS-OLD, BEATEN AT NURSERY
 By DANA CESSNA
 Times Staff Writer
City detectives today were investigating the beating of an 18-months-old child, which her parents claim was administered at a nursery school.
Det. Sgt. Warren Lawton identified the child as Synthia (sic) Lee Marsh, daughter, of Mr. and Mrs. Russel A. Marsh, 1808 Bouganvillia Ave.
Lawton said medical examiners at Tampa General Hospital verified that the child had been severely beaten on the buttocks and right leg.
One examiner indicated that the beating was probably administered with a paddle-like object on the bare skin. He ruled out the likelihood that the blows could have come from an ordinary spanking.
The incident was reported to police last night by the Marsh couple.
They told Patrolman James Cooper that they left Cynthia at the nursery, at 7 a.m. Tuesday. When the father called for the child around 4 p.m., and took her home, he discovered the bruises.
Police were told by Mr. and Mrs. Marsh that they telephoned the operator of the nursery, and that she denied the child had been punished in any manner.
[3] POLICE CHECK
 EATING OF
 SMALL GIRL

Police probed yesterday the beating of an 18-month-old girl which a county medical examiner said had been inflicted with "a paddle or some facsimile."
The child's parents told police they believed the bruise marks had been administered at a local day nursery.
Patrolman James Cooper said Cynthia Lee Marsh, daughter of Mra. (sic) and Mrs. R.A. Marsh of 1808 Bouganvilla Ave., was examined at Tampa General Hospital where Marsh had taken her upon discovery of the marks.
The father said he noticed the marks when he returned home Tuesday afternoon after picking up the child.
Medical Examiner Dr. J.B. Hutcheson, police said, declared that the "bruises were caused by a paddle or some facsimile."
Police said the parents told them the nursery owner denied administering any punishment to the child.
[4] Nursery School Cleared in Child's Injury Case

In its issue of Feb. 1, 1961, The Times reported a pending investigation of injury to 18-months-old Cynthia Lee Marsh, daughter of Mr. and Mrs. Russell A. Marsh of 1808 Bouganvillia Ave. The Times reported that city detectives were investigating the claim made by the parents that the child was beaten at a nursery school it was attending on Jan. 31, 1961.
The article also reported that the nursery school had denied to the parents that it had punished the child in any way. Subsequent investigation resulting from the making of the charge has disclosed that the child's bruises resulted from an earlier fall at the child's home and were not caused by or suffered at the school. This conclusion of the investigators was reported by The Times in its issue of Feb. 8, 1961.
While neither the proprietor of the nursery school nor the school were identified in the Times' articles, the proprietor has complained that her reputation and that of the nursery have been harmed by the adverse publicity accompanying the episode, including the report by The Times of the pending investigation. The Times picked up the story of the investigation from the City Police blotter, and recognized it as an item of news of such public interest and concern to the community that it should be published.
The article was not published with intent to harm anyone but only in fulfillment of The Times' obligation as a newspaper to bring to the attention of the community news items concerning matters of vital public interest. If the nursery school or its proprietor has been harmed The Times regrets it and extends its sincere apology therefor, for the nursery school and its proprietor have been completely exonerated from any connection whatsoever with the child's injury as a result of the investigation above referred to and as far as The Times can ascertain were completely without fault. The Times is glad to publish this retraction and to correct any implication of misconduct on the part of the nursery school or its proprietor which may have been gleaned from its previous articles which merely reported that a charge had been made and denied.
[5] The Tribune retraction is an adaptation of the above language, substantially the same as that published in the Times.