196 So.2d 465 (1967)
Woodrow BROWN, Appellant,
v.
FAWCETT PUBLICATIONS, INC., a Delaware Corporation, and Duval Bibb Company, a Florida Corporation, d/b/a Hillsboro News Company, Appellees.
No. 5881.
District Court of Appeal of Florida. Second District.
March 10, 1967.
Rehearing Denied April 10, 1967.
H. Eugene Johnson and John D. Menas, Tampa, for appellant.
Louis M. Jepeway, of Jepeway & Gassen, Miami, for appellees.
*466 PIERCE, Judge.
This is an appeal by appellant Woodrow Brown, plaintiff in the Court below, from an order entered on January 6, 1965, by the Hillsborough County Circuit Court granting new trial on behalf of Fawcett Publications, Inc., defendant below, after a jury verdict in favor of Brown against Fawcett Publications upon trial of an action brought for libel.
The jury had returned a verdict against the publisher defendant finding no actual damages but awarding $45,000 punitive damages. The defendant, by motion for new trial, contended that the trial Court was in error in failing to give Jury Instruction No. 7, requested by the defendant, which was as follows:
"Under the facts before you, it will be your duty to determine whether punitive damages should be assessed against the defendant if you find that the defendant did in fact libel the plaintiff. Before punitive damages can be assessed against the defendant, however, there must be proof of express malice. In other words, while some malice is inferred automatically from a libelous publication, this type of malice is not sufficient for the awarding of punitive damages and before such punitive damages can be awarded, the plaintiff must prove by a preponderance of the evidence that express malice, or malice in fact, exists. This type of malice is such as would indicate ill-will, hostility or an intention to defame or injure the plaintiff."
Plaintiff contended that the matter of punitive damages was fairly covered by the trial Court in the instructions as given. The trial Court upheld the defendant publisher and granted a new trial, citing Montgomery v. Knox, 1887, 23 Fla. 595, 3 So. 211; 20 Fla.Jur. 612; and an excerpt in 33 Am.Jur., page 289. From this order plaintiff has appealed to this Court and urges that, upon the entire record and considering the given instructions to the jury in their entirety, the trial Judge was in error in granting defendant's motion and ordering a new trial. We hold that the trial Judge fairly and adequately charged the jury as to all aspects of the case, that said requested Jury Instruction No. 7 was defective, and that the verdict of the jury should not have been set aside.
We interpolate at this point to observe that we are cognizant "a stronger showing is required to reverse an order granting a new trial than one denying it", Mead v. Bentley, Fla. 1952, 61 So.2d 428, but here, the point being one strictly of law uncontaminated with factual conflict, the area of discretion is drastically diminished if not entirely eliminated. We interpolate further to mention that plaintiff voluntarily withdrew special damages from the jury, leaving punitive damages the only practical element of damages for consideration.
The basic facts of the case are without substantial conflict. Fawcett Publications, Inc. is the New York owner and publisher of a magazine called "True Police Cases" of general circulation throughout the country, including Hillsborough and Pasco counties, Florida. In its monthly issue of April, 1961, the magazine featured a story entitled "Girl In The Open Grave" wherein is depicted the lurid, sensational and sordid story made the basis of the subject libel suit. In the article, which not only names plaintiff but also features his picture, he is held up, in effect, as a lecher, a sodomist, a rapist, a "Peeping Tom", a murderer and a generally animalistic brute. The facts, as they may be gleaned from the morass of morbidly sensational expletives and interjectories, concern the ravishing and murder of young twenty year old Patricia S----, a housewife and mother of an infant daughter, in the rural community of Zephyrhills, Pasco County, near Tampa, Hillsborough County, on the night of October 7, 1960. To illustrate the tenor of the thoroughly disreputable story we quote *467 the following passages which are a fair example of its contents:
"He had peeped in a lot of windows, but he had never seen anything like this before * * *
`Like what I was born to see, born to have,' he kept whispering over and over inside his mind where the evil urges festered and bubbled * * *
* * * * * *
"He had to have her. He had to have her if he had to kill to have her.
* * * * * *
"In the bedroom, his mind a turmoil of passion and raging need, he stood for a moment, breathing raggedly, staring at Patricia, the outline of her body against the fabric of her night gown.
* * * * * *
"The man hitting him (Ed Suits) was strong, muscled, and he was putting all his frantic impulses into the blows.
* * * * * *
"The man struck Patricia again, the pine board breaking at last, blood clotted, smeared. He threw it behind him, part of it falling into the baby's crib.
* * * * * *
"His quivering fists reached out, caught the insensible blonde's gown, ripped it away so nothing would be between that beautiful body and him again.
* * * * * *
"In the darkness then, he lifted her again, panting, and ran across a weed-grown field with her to the deeper shadows of a moss-choked fallen tree. And there he had everything he wanted from her, every way he wanted it, his perverted mind driven to wild excesses by his own violence and by her clean and radiant-looking young beauty * *
* * * * * *
"Then sated, like an animal wearied and exhausted, there was nothing for him to do but slink away in the dark, return softly and silently into the black night from which he had come * * *
* * * * * *
"Three men questioned on October 9 by deputies were regarded with suspicion. These men were Lucas Tidings, Woodrow Brown and John Bement.
* * * * * *
"Brown's address was ascertained to be that of a boarding house in Tampa, Florida * * *
"Gaining admittance, the lawmen found the suspect's room a vile rookery of dirty stories, lewd pictures, smutty magazines  all the soothing literature of an ailing mind.
* * * * * *
"Meanwile in Zephyrhills, Sheriff Bessenger ran a check on Woodrow Brown, learned the following facts about him: Born May 13, 1913, Brown, a carpenter by trade, was a sodomite by choice.
* * * * * *
"And Sheriff Bessenger had proof that this unsavory ex-convict with a long criminal record had been in the area of the murder on the night Patricia Ann was slain. He was a convicted Peeping Tom, and worse, no one could swear that he was in bed on that fatal evening  as his family had supposed and so stated on questioning.
* * * * * *
"This lawbreaker had gone casually about his life during these past weeks, coming and going in Zephyrhills, working at his job as carpenter."
To further pin-point the article as being directed toward plaintiff Woodrow Brown, there was appended to the narration the printed note: "[t]he names Lucas Tidings and John Bement, as used in the foregoing story, are fictitious. The real names have been changed to protect the identities of the actual persons concerned." Woodrow Brown was not included in this "delousing", *468 the significance of which is pointedly obvious.
At the time the April, 1961, issue hit the newsstands plaintiff Brown was in the Pasco County jail for suspicion of the crimes, but on April 4, 1961 the Pasco County grand jury exonerated Brown of any part in the criminal business by declining to indict him upon grossly insufficient evidence. He was forthwith released from custody.
On December 29, 1961, and again on January 29, 1962, plaintiff invoked F.S. Sec. 770.01, F.S.A. by serving written notice on Fawcett, the publisher, demanding apology and retraction of the specified article in the manner required by the statute.[1] Fawcett refused to avail itself of the benefit of apology and retraction afforded by F.S. Sec. 770.02, F.S.A.[2] which would legally have restricted plaintiff to actual damages. On the contrary, Fawcett ignored such notice and demand until its magazine issue of some thirteen months later, wherein is contained the following belated advice to the public:
"Woodrow Brown is innocent. When our story `Girl In The Open Grave', was published in the April 1961 issue of `True Police Cases', Woodrow Brown was awaiting trial.[3] We are pleased to report that on April 4, 1961, the Pasco County, Florida, Grand Jury decided that there was insufficient evidence against Woodrow Brown to justify indictment for prosecution for the murder of Patricia ____. (deleted here). Woodrow Brown was therefore immediately released from the County Jail where he had been held since November 16, 1960".
In his charge to the jury the trial Judge held the article to constitute libel per se as a matter of law, in the following language:
"Now, in this regard, gentlemen, I have ruled, I have determined as a matter of law that the Plaintiff, the article about the Plaintiff contains certain items, that in the law of libel we call libel per se, that is as to his being a peeping tom and as to his having pornographic and lewd literature in his house."
The trial Judge was generous to defendant publisher in giving to the jury in elaborate detail the defenses of "good faith", also "good motives", also "the right of comment", also "qualified privilege", and even "the defense of truth".
On the question of malice and punitive damages, the Court charged the jury as follows:
"Malice may be implied or inferred where the plaintiff is accused of a crime. In other words, if you are reasonably satisfied from the evidence that the Defendant accused the Plaintiff of a crime he did not commit, then you may infer that it was maliciously made, and it is not necessary to prove any express malice in order to warrant a verdict for the plaintiff under those circumstances.
* * * * * *
"Punitive damages are awarded for the purpose of punishing the Defendant, if you find from the evidence in this case that such are called for, to punish the *469 Defendant for the wrongful action of libel, and to set an example before the community, in the event that you find that this libel was a per se libel, and is one that justifies or calls for your applying a punishment of this nature to them, not only as an example to them, but also to deter others, who might see this example, from doing the same thing.
"As I say, they are awarded for the purpose of punishing the Defendant from the wrongful act of a libel, and so set an example for others. Its purpose is to serve as a warning to prevent this Defendant and others from being guilty of committing a libel in this instance."
We now consider the authorities cited by the trial Judge as supporting his order granting a new trial, and we preface our review by saying that they are actually authority to the contrary.
Montgomery v. Knox was an 1887 opinion reviewing a judgment for plaintiff in a libel action based upon a written publication imputing to plaintiff the intentional burning of a stock of goods in his store and making a fraudulent insurance claim thereon. The article in question had been first published in the "Mutual Observer", a trade paper of limited publication, and thereafter reproduced in the "Orange Growers' Gazette", a local public newspaper. The question of exemplary or punitive damages was involved, and the Supreme Court, in passing upon the point, said (3 So. text 217):
"Under the plea of not guilty, where the publication is actionable per se, malice is implied, which is sometimes termed legal malice, and this malice does not necessarily authorize the finding of exemplary or punitive damages. If there is nothing in the character of the publication itself to show express malice,  that is ill will, hostility, evil intention to defame and injure,  the occasion for exemplary or punitive damages does not arise, unless there is some proof to establish such express malice; in other words, proof of malice in fact." (Emphasis supplied).
Thus Montgomery holds in so many words that punitive damages are authorized where the proof shows either (1) malice in fact, i.e. express malice, or (2) ill will, hostility, or evil intention to defame and injure deducible from the character of the publication itself, which is the equivalent of express malice.
In the 8th headnote in Montgomery, the Court approved a charge to the jury that if they were satisfied the publication was made from "ill will" they could find exemplary or punitive damages to such extent as the facts and circumstances in evidence might justify.
Also Montgomery further held inter alia that 
"[i]f the belief which prompted the publication was an unreasonable one, that and falsity did not necessarily imply express malice; but were facts to be left to the jury along with others. It was their province to decide upon the sufficiency of the evidence to show express malice." (Emphasis supplied).
So Montgomery does not support the trial Judge's order.
20 Fla.Jur., page 612, § 90, the second authority cited by the Judge in his order, reads as follows:
"§ 90. Punitive Damages.
"The purpose of punitive damages is not to compensate but only to serve as a deterrent to others inclined to commit a similar offense. They are characterized as an allowance for malice, moral turpitude, wantonness, or outrageousness in the commission of the tort. Accordingly, in a suit for libel, although no special damage may have been proved, the plaintiff may recover what is known as exemplary or punitive damages on a showing that the publication was made from malice or ill will toward the plaintiff. But from implied malice alone an award of exemplary or punitive damages is not authorized. If there is nothing in the character *470 of the publication itself to show express malice  that is ill will, hostility, or evil intention to defame or injure  the occasion for exemplary or punitive damages does not arise. In other words, to justify such an award some proof to establish express malice, or malice in fact, is necessary." (Emphasis supplied).
The above text cites in support only the cases of Montgomery v. Knox, supra, also Ross v. Gore, Fla. 1950, 48 So.2d 412 and Miami Herald Pub. Co. v. Brown, Fla. 1953, 66 So.2d 679.
Montgomery v. Knox has already been discussed.
In Ross v. Gore, the only reference to punitive damages is the following comment (text 48 So.2d 414):
"As to * * * `punitive damages,' such damages are allowed, not as compensation to a plaintiff, but as a deterrent to others inclined to commit a similar offense, and their allowance depends on malice, moral turpitude, wantonness or outrageousness of tort. Dr. P. Phillips & Sons, Inc. v. Kilgore, 152 Fla. 578, 12 So.2d 465." (Emphasis supplied).
Miami Herald v. Brown holds that Sec. 770.02, if properly complied with by the publisher, rules out punitive damages. Here Fawcett defied Sec. 770.02, which action in effect invited punitive damages.
So Fawcett can find neither solace nor comfort in its quest for a new trial in 20 Fla.Jur. as quoted, nor the authorities cited in support of the text.
We come to the last of the trial Judge's citations in his new trial order.
In 33 Am.Jur., on page 289, appears the following observation made by the text writer:
"It is clear, of course, that an instruction which authorizes an award of punitive damages without finding actual malice is incorrect."
In the first place we have no such affirmative instruction in the instant case. In the second place, the quotation deals with an instruction that had been given; here we are dealing with an instruction (No. 7) that was refused. In the third place, the quotation itself was based upon only one case, that of The Philadelphia, Wilmington, & Baltimore Railroad Company v. Quigley, 21 How. 202, 16 L.Ed. 73, which again does not support the text. In that case, which was decided in 1859 before the Civil War, the U.S. Supreme Court reviewed a judgment for the plaintiff in a libel action brought against the railroad company. The libel consisted of a communication from an architect to the company President disparaging a "general foreman" of the railroad, which was included in a report printed for the use of the President and Directors. The main issue upon appeal was the question of whether or not the communication was privileged, but the high Court disposed of the case because the suit was prematurely brought inasmuch as the critical publication "took place after the commencement of the suit." But in the course of the opinion the matter of exemplary damages was touched upon and the high Court, citing Day v. Woodworth, 13 How. 363, 371, 14 L.Ed. 181, said:
"Whenever the injury complained of has been inflicted maliciously or wantonly, and with circumstances of contumely or indignity, the jury are not limited to the ascertainment of a simple compensation for the wrong committed against the aggrieved person. But the malice spoken of in this rule is not merely the doing of an unlawful or injurious act. The word (malice) implies that the act complained of was conceived in the spirit of mischief, or of criminal indifference to civil obligations." (Emphasis supplied).
Holding that the evidence in that particular case did not measure up to the quoted language, the Court held that 
"The circumstances under which the evidence was collected, and the publication *471 made, repel the presumption of the existence of malice on the part of the corporation * * *".
The Supreme Court did not think enough of the materiality of exemplary damages in that case to make it the subject of a headnote, and the only discussion of it in the opinion are the above quotations. Yet the text writer in American Jurisprudence made the entirely misleading observation hereinbefore quoted upon the sole authority of the railroad case.
Elsewhere in the same volume of American Jurisprudence, the text writer is more articulate in discussion of exemplary or punitive damages in libel actions. In 33 Am.Jur. page 190, § 202, the rule is ably laid down:
"Where, under the rule prevailing in the particular jurisdiction, the recovery of exemplary or punitive damages is authorized or permitted, an award of compensatory damages for defamation may be supplemented by an allowance of punitive damages whenever it is made to appear that the defendant acted with malice, or with such gross and reckless negligence as to amount thereto. Furthermore, where the defamation complained of is actionable per se, it is generally held that punitive damages may be awarded * * *. But where the defamation is not actionable per se, punitive damages cannot be allowed unless either general or special damage is shown.[4] There seems, however, to be some difference of opinion as to the character of malice that will support an award of punitive damages. While some tribunals insist upon a showing of actual or express malice, or of a reckless disregard of the plaintiff's rights, or of such a clear absence of basis for the publication as to warrant an inference of ill-will or hatred, others hold proof of actual malice to be unnecessary when the language used was defamatory per se or when the occasion was unprivileged and no valid excuse is offered." (Emphasis supplied).
No Florida case was cited under either of the latter alternative "difference[s] of opinion", but even under the first alternative of the more rigid rule there would be ample basis for support of the jury's verdict in the "reckless disregard of the plaintiff's rights" or the bitter salaciousness pervading the language of the article to "warrant an inference of ill will". And there is no question under the second alternative that the article was defamatory per se. The lower Court so found as a matter of law.
Further support for our view is found in Judge Horton's very excellent opinion in the 3rd District Court case of Miami Herald Publishing Co. v. Brautigam, Fla.App. 1961, 127 So.2d 718. In that case Brautigam was the incumbent state attorney, and the grand jury, which was attended by Brautigam in his official capacity, was attempting to release and file a "grand jury report" critical of certain local officials (not including Brautigam or any member of his staff) without indicting them, which report Brautigam was seeking to prevent being filed and to be suppressed. While the matter was hanging in a state of flux, the Miami Herald published two editorials critical of Brautigam, and refused retraction. Brautigam later brought action for libel against the newspaper. The issues as made up in the case were strikingly similar to the instant case. The jury returned a verdict for Brautigam, awarding him compensatory damages in the sum of $25,000 and punitive damages in the sum of $75,000.
The Brautigam opinion discusses the legal status of a libel per se in the following language (text 127 So.2d 722):
"The reported decisions of this state, as well as others, clearly establish that a publication is libelous per se; that is, actionable, per se; without a showing of *472 special damage, if it imputes to another (a) a criminal offense amounting to a felony; or (b) a presently existing venereal or other loathsome and communicable disease; or (c) conduct, characteristics, or a condition incompatible with the proper exercise of his lawful business, trade, profession or office; or (d) the other being a woman, acts of unchastity. Teare v. Local Union No. 295, Fla. 1957, 98 So.2d 79.
"The principle defenses to an action upon a publication, libelous, per se, are consent, justification and privilege. The defense of privilege has been by some subdivided into three distinct classifications, i.e., (1) absolute privilege; (2) qualified privilege; and (3) fair comment. See 3 Restatement, Torts, Chap. 25. Others classify the defense of fair comment as merely another aspect of the defense of qualified privilege. See Prosser, Torts, 2d Ed., § 95, p. 607. Cf. Jones v. Townsend's Administratrix, 21 Fla. 431; and Montgomery v. Knox, 23 Fla. 595, 3 So. 211; with State ex rel. Arnold v. Chase, 94 Fla. 1071, 114 So. 856, and White v. Fletcher, Fla. 1956, 90 So.2d 129." (Emphasis supplied).
In Brautigam the trial Judge refused to charge the jury that the burden was upon Brautigam to prove actual malice, the identical point here involved. The opinion in Brautigam had this to say upon that question (text 127 So.2d 723):
"The appellant contends that the trial judge erroneously failed to instruct the jury that the burden of proof was upon Brautigam to show the falsity of the editorials and the newspaper's actual malice in the publication thereof. The trial judge did instruct the jury that the defense of truth, plus good motives and fair comment, are affirmative defenses as to which the defendant has the burden of proof. He further charged the jury, as a matter of law, that the editorials were matters of public interest.
"As to the defense of fair comment, the jury was instructed that if it should find the editorials met the test of fair comment, the defendant would have then carried the burden of proof as to this affirmative defense, and in such event, the burden was on the plaintiff to prove the defendant's publication of the editorials was motivated by actual malice." (Emphasis supplied).
This is exactly what happened in the instant case and exactly what the Court charged the jury; only the trial Court here charged that "fair comment", if the jury found the article to be such, would be a complete defense, rather than merely shifting the burden to plaintiff. The instant jury's necessary finding against the issue of "fair comment" is conclusively shown in its verdict, which awarded plaintiff $45,000 punitive damages.
The Brautigam opinion sums up the question of punitive damages in the following language (text 127 So.2d 723-4):
"The appellant further complains that the court erred in permitting the issue of punitive damages to go to the jury. As stated in Phillips & Sons v. Kilgore, 152 Fla. 578, 12 So.2d 465, 467.
"Punitive or exemplary damages is an amount allowed over and above actual or compensatory damages. Its allowance depends on malice, moral turpitude, wantonness, or the outrageousness of the tort and is awarded as a deterrent to others inclined to commit a like offense. It is in the province of the trial court to determine as a matter of law whether or not there is a basis for punitive damages and instruct the jury accordingly. Whether or not the elements are present to warrant it is for the jury in the light of all the facts of the case.'" (Emphasis supplied).
This last observation concisely states the law as to punitive damages in libel actions. Such damages depend on *473 "malice [or] moral turpitude [or] wantonness [or] the outrageousness of the tort, and is awarded as a deterrent to others inclined to commit a like offense".
In Abram v. Odham, Fla. 1956, 89 So.2d 334, text 336, the Supreme Court said:
"Evidence of malice may be either intrinsic, that is, inferable from the very nature of the defamatory language itself, or extrinsic. Myers v. Hodges, supra, 53 Fla. 197, 44 So. 357, 365."
Jury Instruction No. 7 requested by defendant was deficient because it stated that before punitive damages could be awarded "there must be proof of express malice" which is a "type of malice * * * as would indicate ill will, hostility or an intention to defame or injure the plaintiff". The vice is that it fails to make ill will, hostility, an intention to defame or injure, wantonness, or outrageousness of the tort the equivalent or the alternative of express malice, but on the contrary only an indication thereof. The numerous authorities, supra, clearly show that all such elements are the equivalent of express malice.
And the rationale of all this is obvious. If malice necessary to warrant exemplary damages had to be express, such as "I hate you", or "I'm going to ruin your character even if I have to lie about you to do it", it would reduce the law of punitive damages in libel actions to a farce and a mockery. People just don't advertise their libels in advance
Getting back to the case at bar, the publisher Fawcett depicted the plaintiff in a magazine widely distributed all over the country, as a murderer, a sodomist, a rapist, a lecher, and a degenerate brute, when in fact and in truth he was an innocent man. And when Fawcett was notified in writing, not once but twice, that such defamatory accusations were false, it deliberately spurned the request to retract and apologize, which would have immunized it from exemplary damages, and chose instead to figuratively thumb its nose at not only the unfortunate victim of its journalistic assassination but also the world at large. Can there be any doubt or question that the magazine publisher had toward the plaintiff anything but ill will, or a hostile attitude, or an intent to injure and defame, or at least a callous disregard for the resultant effect of its cruel indifference?[5]
The article was so defamatory on its face that the jury had ample reason to find that it was the consequence of the aforesaid elements, which are equivalent to and in fact constitute express malice. To contend otherwise would be to make a play on words or to engage in a meaningless game of semantics, the niceties of which have no place in a matter of such serious import.
To paraphrase the language of the Supreme Court in the libel case of O'Neal v. Tribune Company, Fla. 1965, 176 So.2d 535, text 538, "[a]fter a careful review of the instructions, we find that, when considered in their totality, there was no prejudicial error."
The order appealed from is therefore reversed and the cause remanded with directions to enter the judgment called for by the jury's verdict.
Reversed and remanded.
SHANNON, Acting C.J., concurs.
LANE, A.H., Associate Judge, concurs specially with opinion.
LANE, A.H., Associate Judge (concurring specially).
I concur in the foregoing opinion.
My consideration of the record in the case has lead me to the conclusion, however, *474 that the law of libel has itself become somewhat of a "game of semantics" which has created another thicket from which we need escape. It appears to me that a first step would be the abandonment of the term "express malice" since this term is not accurate to describe the element of libel necessary to support the award of punitive damages. Almost without exception, the authorities, including the case of Montgomery v. Knox, 23 Fla. 595, 3 So. 211, define express malice as ill will, hostility or evil intention to defame and injure and hold that this "express malice" may be implied or inferred from the character of the publication itself. It is also well established in the law that the publisher of a libel may be answerable in punitive damages if the publication is made with willful, wanton or reckless disregard for the rights of the party libeled. In short, the term "express malice" carries with it the connotation of animosity by the publisher specifically directed toward the complainant, while it is apparent that evidence of such an attitude or condition of mind on the part of the publisher is not necessary to support the award of punitive damages against him.
In the appropriate case and when supported by the evidence, the trial court should go directly to the meat in the coconut and after definition and explanation of punitive damages instruct the jury to the effect that if it finds from the evidence, including the character of the publication itself, that the defendant was motivated by ill will, hostility or evil intention to defame and injure or that the defendant acted with willful, wanton or reckless disregard for the rights of the plaintiff, it should award punitive damages against the defendant.
The problem of clear and concise explanation to the jury which confronts the trial judge under the present state of the law is pointed up in this case by the concern which the learned trial judge here manifested.
NOTES
[1] F.S. Sec. 770.01, F.S.A. provides: "Before any civil action is brought for publication, in a newspaper or periodical, of a libel, the plaintiff shall, at least five days before instituting such action, serve notice in writing on defendant, specifying the article, and the statements therein, which he alleges to be false and defamatory."
[2] F.S. Sec. 770.02, F.S.A. provides: "If it appears upon the trial that said article was published in good faith, that its falsity was due to an honest mistake of the facts, and that there were reasonable grounds for believing that the statements in said article were true, and that within ten days after the service of said notice a full and fair correction, apology and retraction was published in the same editions or corresponding issues of the newspaper or periodical in which said article appeared, and in as conspienous place and type as was said original article, then the plaintiff in such case shall recover only actual damages."
[3] Brown was not "awaiting trial" but was "awaiting" grand jury consideration.
[4] In the instant case the trial Court actually held the defamation to be actionable per se and so charged the jury.
[5] Libel in this regard has an identical analogy in the field of negligence and of fraud.