**E. Howard HUNT, Jr., Plaintiff-Appellee,**

v.

**LIBERTY LOBBY, a D.C. Corp., Defendant-Appellant.**

No. 82–5321.

United States Court of Appeals, Eleventh Circuit.

Nov. 28, 1983.

15.

Fleming Lee, Washington, D.C., Carey P. DeDeyn, Sutherland, Asbill & Brennan, Atlanta, Ga., Francis M. Gregory, Jr., Washington, D.C., for defendant-appellant.

Ellis Rubin, Miami, Fla., William A. Snyder, Jr., Ober, Grimes & Shriver, Kevin A. Dunne, Baltimore, Md., for plaintiff-appellee.

Morrison & Foerster, Henry D. Levine, Washington, D.C., Bruce Rogow, American Civil Liberties Union Foundation of Florida, Nova University Law Center, Fort Lauderdale, Fla., Talburt, Kubicki & Bradley, Miami, Fla., for amicus ACLU.

Before HILL, KRAVITCH and HENDERSON, Circuit Judges.

ALBERT J. HENDERSON, Circuit Judge:

The appellant, Liberty Lobby, publishes the Spotlight, a weekly newspaper distributed nationally by subscription. E. Howard Hunt, the appellee, brought this action against Liberty Lobby in the United States District Court for the Southern District of Florida seeking damages for libel based upon an article appearing in the August 14, 1978 edition of the Spotlight.[1] The jury returned a verdict for Hunt in the amount of $100,000.00 compensatory and $550,000.00 punitive damages. On appeal Liberty Lobby makes several assignments of error including insufficiency of the evidence of actual malice, incorrect jury instructions, erroneous admission of certain affidavits into evidence and improper venue. Because the sufficiency of the evidence is vigorously contested, we begin with a thorough description of the pertinent facts.

The front page of the August 14, 1978 Spotlight announced in bold face type: "CIA TO NAIL HUNT FOR KENNEDY KILLING". The headline referred the reader to page four for the details. On page four a larger headline stated "CIA TO 'ADMIT' HUNT INVOLVEMENT IN KENNEDY SLAYING." A biography of Victor Marchetti, the author of the article, appeared on this page. This brief background of the author explained that Marchetti "has been involved in U.S. Intelligence activities for almost 20 years, 14 years of that time being with the CIA, the last three years of which he was staff assistant to Richard Helms. He is the author of 'The CIA and the Cult of Intelligence' and 'The Rope Dancer.'"

The text of the article revealed an elaborate plot within the Central Intelligence Agency (CIA) to frame Hunt for the Kennedy assassination. We quote the pertinent passages at length in order to avoid any distortion of the article's meaning:

A few months ago, in March, there was a meeting at CIA headquarters in Langley, Va., the plush home of America's super spooks overlooking the Potomac River. It was attended by several high-level clandestine officers and some former top officials of the agency.

The topic of discussion was: What to do about recent revelations associating President Kennedy's accused assassin, Lee Harvey Oswald, with the spy game played between the U.S. and the USSR? (SPOTLIGHT, May 8, 1978.) A decision was made, and a course of action determined They were calculated to both fascinate and confuse the public by staging a clever 'limited hangout' when the House Special Committee on Assassina-

---

1. Hunt's original complaint named Liberty Lobby and Victor Marchetti as defendants. Marchetti, a freelance writer based in Washington, D.C., was the author of the article in controversy. Hunt's cause of action against Marchetti was dismissed by the district court because of a lack of jurisdiction over him in the Southern District of Florida. Hunt does not appeal that ruling.

tions (HSCA) holds its open hearings, beginning later this month.

A 'limited hangout' is spy jargon for a favorite and frequently used gimmick of the clandestine professionals. When their veil of secrecy is shredded and they can no longer rely on a phony cover story to misinform the public, they resort to admitting—sometimes even volunteering—some of the truth while still managing to withhold the key and damaging facts in the case. The public, however, is usually so intrigued by the new information that it never thinks to pursue the matter further.

We will probably never find out who masterminded the assassination of JFK—or why. There are too many powerful special interests connected with the conspiracy for the truth to come out even now, 15 years after the murder.

But during the next two months, according to sensitive sources in the CIA and on HSCA, we are going to learn much more about the crime. The new disclosures will be sensational, but only superficially so. A few of the lesser villains involved in the conspiracy and its subsequent coverup will be identified for the first time—and allowed to twist slowly in the wind on live network TV. Most of the others to be fingered are already dead.

But once again the good folks of middle America will be hoodwinked by the government and its allies in the establishment news media. In fact, we are being set up to witness yet another coverup, albeit a sophisticated one, designed by the CIA with the assistance of the FBI and the blessing of the Carter administration.

A classic example of a limited hangout is how the CIA handled—and manipulated—the Church Committee's investigation of two years ago. The committee learned nothing more about the assassinations of foreign leaders, illicit drug programs, or the penetration of the news media than the CIA allowed it to discover. And this is precisely what the CIA is out to accomplish through HSCA with regard to JFK's murder.

## THEY'LL HANG HUNT

Chief among those to be exposed by the new investigation will be E. Howard Hunt, of Watergate fame. His luck has run out, and the CIA has decided to sacrifice him to protect its clandestine services. The agency is furious with Hunt for having dragged it publicly into the Nixon mess and for having blackmailed it after he was arrested.

Besides, Hunt is vulnerable—an easy target, as they say in the spy business His reputation and integrity have been destroyed. The death of his wife, Dorothy, in a mysterious plane crash in Chicago still disturbs many people, especially since there were rumors from informed sources that she was about to leave him and perhaps even turn on him.

In addition it is well known that Hunt hated JFK and blamed him for the Bay of Pigs disaster. And now, in recent months, his alibi for his whereabouts on the day of the shooting has come unstuck.

In the public hearings, the CIA will 'admit' that Hunt was involved in the conspiracy to kill Kennedy. The CIA may go so far as to 'admit' that there were three gunmen shooting at Kennedy. The FBI, while publicly embracing the Warren Commission's 'one man, acting alone' conclusion, has always privately known that there were three gunmen. The conspiracy involved many more people than the ones who actually fired at Kennedy, both agencies may now admit.

## POSING AS BUM

A.J. Weberman and Michael Canfield, authors of 'Coup d'etat In America,' published pictures of three apparent bums who were arrested at Dealy Plaza just after President Kennedy's murder, but who were strangely released without any record of the arrest having been made by the Dallas police. One of the tramps the authors identified as Hunt. Another was Frank Sturgis, a long-time agent of Hunt's.

Hunt immediately sued for millions of dollars in damages, claiming he could

prove that he had been in Washington, D C, that day—on duty at CIA. It turned out, however, that this was not true. So, he said that he had been on leave and doing household errands, including a shopping trip to a grocery store in Chinatown.

Weberman and Canfield investigated the new alibi and found that the grocery store where Hunt claimed to be shopping never existed. At this point, Hunt offered to drop his suit for a token payment of one dollar. But the authors were determined to vindicate themselves, and they continued to attack Hunt's alibi, ultimately completely shattering it.

Now, the CIA moved to finger Hunt and tie him to the JFK assassination. HSCA unexpectedly received an internal CIA memorandum a few weeks ago that the agency just happened to stumble across in its old files. It was dated 1966 and said in essence: Some day we will have to explain Hunt's presence in Dallas on November 22, 1963—the day President Kennedy was killed. Hunt is going to be hard put to explain this memo, and other things, before the TV cameras at the HSCA hearings.

Hunt's reputation as a strident, fanatical anti-communist will count against him. So will his long and close relationship with the anti-Castro Cubans, as well as his penchant for clandestine dirty tricks and his various capers while one of Nixon's plumbers. E. Howard Hunt will be implicated in the conspiracy, and he will not dare to speak out—the CIA will see to that.

The article also included a photograph of Hunt captioned "Howard Hunt—He'll be thrown to the wolves." [2]

Shortly after this edition was distributed, Hunt contacted his attorney, who, in turn, wrote to the appellant demanding a retraction. In response, Liberty Lobby indicated

that it would make a "thorough and conscientious" investigation of the matter. When the results of this "investigation" were not forthcoming after three weeks, Hunt's attorney again communicated with the appellant inquiring into the status of the matter. In the final letter that preceded the institution of the law suit, Liberty Lobby professed its confidence in the accuracy of Marchetti's article. The letter offered Hunt the opportunity to come to the appellant's office in Washington, D.C. to present his side of the story in an interview with Liberty Lobby employees to be published in an upcoming edition of the Spotlight. Dissatisfied with this proposal, Hunt filed his complaint.

The trial of the case was simplified by two concessions made by the parties. First, Hunt stipulated that he is a "public figure" and accordingly, that he was required to prove by clear and convincing evidence that Liberty Lobby published any falsehoods contained in Marchetti's article with "actual malice" as that term is defined in *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). Second, Liberty Lobby acknowledged that Hunt was not in Dallas, Texas on the day that President Kennedy was murdered.[3] Thus, Hunt was relieved of any burden of proving that he, in fact, did not kill the President.

Hunt's evidence at the trial consisted of (1) his extensive live testimony; (2) the deposition testimony of Edward J. Dunn, Jr. and Walter Kuzmak, personal acquaintances of Hunt; (3) the deposition testimony of Willis Carto and James P. Tucker, the Chairman of the Executive Committee and the managing editor of the Spotlight respectively; (4) the original manuscript of Marchetti's article with the handwritten changes made by Carto and Tucker; and (5) three affidavits from CIA officials that

**2.** Marchetti's article also described the CIA's plan to implicate other individuals in the upcoming hearing before the House Assassinations Committee.

**3.** Even though Liberty Lobby admitted that Hunt was not in Dallas, Hunt presented the deposition testimony of one witness who stated that he saw Hunt in Washington, D.C. on the day of the Kennedy assassination.

each had searched the CIA files for memoranda pertaining to Hunt's whereabouts on the day that Kennedy was killed and had found no such records. Liberty Lobby called only one witness, Robert Bartel, the Chairman of the Board of Policies of Liberty Lobby. Marchetti did not testify at the trial, nor did either party take his deposition.[4]

Hunt's testimony covered several areas. He described his background with the CIA including his involvement in the Bay of Pigs invasion. He recounted his role in the "Watergate" break-in, admitting that he pleaded guilty to federal criminal charges arising therefrom and served thirty-three months in prison. It was brought out that Hunt was a prolific writer of mystery novels and considered himself to be an experienced journalist. Hunt recalled the effects that the publication of Marchetti's article had on him, expressing his opinion that it had a serious negative impact both on his personal and professional life. In an effort to illustrate the depth of his reaction, he stated that he demanded to appear before the House Assassinations Committee in order to clear his name.[5]

Hunt was also questioned about publications prior to the Spotlight story linking him with the assassination. Hunt stated that other writers had advanced the proposition that he was involved in a conspiracy to murder the President. He described his public denials of any involvement and introduced press clippings reporting his protestations of innocence.[6]

During his direct examination Hunt stated that he had filed lawsuits against the authors of publications which accused him of participation in President Kennedy's murder. He said that he sued the "National Tattler" for such a story, but that its publisher went bankrupt "coincidentally with my receiving a default judgment in federal court." Tr. 76. Hunt also testified that he presently had pending a suit against the authors of a book entitled "Coup d'etat in America." According to Hunt, this book, which was published in 1975,

> dealt with the so-called tramps, the three bums found located and photographed in Dallas on the day of President Kennedy's assassination.

> There were some photographs, overlays that were submitted with the book which purported to prove or at least very strongly suggest that I was one of the bums, and by virtue of that alleged connection, I was supposed to have been one

4. The only statement emanating directly from Marchetti was his affidavit which Liberty Lobby attached to its motion for summary judgment. The affidavit did not, however, become a part of the trial record.

5. The district court overruled an effort to enter the findings of the Committee into evidence. However, the findings were disclosed to the jury during the reading of Carto's deposition testimony in which he quoted from the report. According to this testimony, the Committee stated that "During the course of the Committee's investigation, a rumor was circulating that the Committee had uncovered a memorandum in CIA files indicating Hunt was in Dallas on November 22, 1963. The rumor was not founded on fact. In addition, Hunt gave the Committee a sworn deposition in which he denied the allegation and the Committee found no evidence that contradicted Hunt's deposition." Tr. 295–96.

6. One such clipping, a February 6, 1975 Associated Press excerpt from the Miami News entitled "Hunt denies part in plot to kill JFK,"

included Hunt's "bitter criticism" of a photograph purportedly depicting him near the scene of the assassination and his unequivocal assertion that he was not in Dallas on November 22, 1963. Also admitted was a June 23, 1975 Time Magazine article which reported the findings of the Rockefeller Commission concerning the CIA's participation in the Kennedy murder. This article stated that the commission had "dismantled" the theory that Hunt was involved in the assassination, that an FBI photoanalyst had determined that Hunt was not pictured in the photograph of three men taken near the crime scene and that the commission found no evidence that Hunt was in Dallas on that day. These press clippings were admitted over Liberty Lobby's hearsay and relevancy objections "to show prior knowledge of these defendants of similar circumstances where Mr. Hunt is accused of what he is accused of in this article and that they should have been advised or on notice." Tr. 77.

of the conspirators in the death of our President.

Tr. 85. Hunt's testimony established that these lawsuits were instituted prior to the publication of the August 14, 1978 Spotlight.

The bulk of Hunt's time on the witness stand focused on the Spotlight article itself including Hunt's opinion of the impression conveyed by the article and the accuracy of the statements contained therein. Hunt stated that the headline "CIA to Nail Hunt for Kennedy Killing" meant that "I was going to be hung for the killing of John F Kennedy." He testified that the headline, "CIA to 'Admit' Hunt Involvement in Kennedy Slaying" was an expansion of the first headline, although he did not understand the import of the term "admit." According to Hunt, the headlines "said to me, and I had to look at these things in terms of what another might infer . . ., that I was going to be charged federally for the killing of John F. Kennedy." Tr. 221–22. He also stated that the subheadline "Posing as a Bum" said "in effect that Hunt had been posing as one of the three . . . bums in Dallas on the day of Kennedy's assassination." Tr. 243. Finally, his attorney took him, line-by-line, through the article, questioning him about the truth of each statement. Hunt responded that virtually every assertion was false.

Hunt's proof then focused on the development of the article. For this evidence, Hunt relied upon the deposition testimony of Willis Carto and James Tucker from the Liberty Lobby. In essence, both testified that they relied upon Marchetti's reputation in deciding to publish his story. They each testified that Marchetti had submitted articles which had been published in the Spotlight in the past without complaint. When questioned about their independent verification of the information, each stated that they trusted Marchetti and that Marchetti assured them that his sources were reliable.[7] According to their testimony, each thought very highly of Marchetti, believed him to have access to high level confidential information and, in general, felt they had no reason to doubt the veracity of his article.[8]

Tucker testified that he asked Marchetti many questions about the article in an effort to ensure that they were on "solid" ground. For example, Tucker said that he asked Marchetti if he had seen the 1966 CIA memorandum referred to in the article and that his recollection of Marchetti's response was that Marchetti stated: "[i]t was shown to me. I was allowed to stand there and read it and give it back." Tr. 373. Tucker indicated that he participated in "several phone calls [and] discussions" with Marchetti about the article, and that, although he was never told the names of any of Marchetti's sources, Marchetti's reassurances of the truth of the story convinced him of its validity.

Carto and Tucker were questioned extensively about one notation made by Carto on Marchetti's manuscript. Appearing next to the following paragraph was the remark, "*Confirm this*!":

A.J. Weberman and Michael Canfield, authors of 'Coup d'etat In America,' published pictures of three apparent bums who were arrested at Dealy Plaza just after President Kennedy's murder, but who were strangely released without any record of the arrest having been made by Dallas police. One of the tramps[9] the authors identified as Hunt. Another as Frank Sturgis, a long-time agent of Hunt's. Hunt immediately sued for mil-

7. Carto recollected that Marchetti told him prior to publication that his sources were "private, confidential sources in the CIA" and that after publication Marchetti told him the names of some of the sources. Carto refused to provide the names, claiming a "journalistic privilege" and stating that he could not remember the names.

8. Carto testified: "we were relying completely on the expertise and knowledge and reputation, the background, the association, the contacts, the integrity of Mr. Marchetti." Tr. 329.

9. The word "tramps" was substituted for "bums" by Carto.

lions of dollars in damages, claiming he could prove that he had been in Washington, D.C., that day—on duty at CIA. It turned out, however, that this was not true.[10] So he said that he was on leave and doing household errands, including a shopping trip to a grocery store in Chinatown.

Pl.Ex. 10.[11] Carto's answers to questions concerning this notation were confusing at best. He stated that he did write it and that Tucker was to be responsible for obtaining the confirmation. It is not clear from his testimony, however, precisely what information he sought. At one point his testimony appears to focus on the fact that Hunt had filed a lawsuit. At another, he indicated that he wanted confirmation that Hunt was not in Washington on the fateful day.[12] Carto was also ambiguous with respect to his receipt of the demanded confirmation. He indicated that he was sure that Tucker reported back that "it was true," but could not recall whether Tucker said how he had confirmed it. He then stated that Tucker "got the information" about

the lawsuit "included." Later, he was not sure that Tucker "checked out the lawsuit per se." Tr. 337. When asked why he felt the information needed confirmation, Carto replied that he felt that it is "prudent at all times to check facts in which there is any degree of unclearness—of unclarity" and that because he "was unaware of this suit and wanted to know more about it," he sought the information. Tr. 307–08.

Tucker's testimony was equally unenlightening. He stated that he was responsible for obtaining the confirmation and that he understood the mark to refer to the paragraph beginning with "Hunt immediately sued . . . ." He said that although he could not remember how he confirmed the lawsuit, he probably would have telephoned Marchetti to determine where the lawsuit had been filed and then would have telephoned a newspaper in that town to ask the details.[13] He remembered it being confirmed to his satisfaction by talking to "Hunt's lawyer or a lawyer for the other side of the issue, his office, or things of that nature." Tr. 400. His testimony suggests

---

**10.** The phrase "that this was not true" was substituted for Marchetti's original phrase, "that he was not."

**11.** This passage was originally written as one paragraph by Marchetti. When it was published, it was broken down into two paragraphs, the second paragraph beginning with the third sentence. Neither Carto nor Tucker could remember which one edited the article first or precisely who inserted which changes. Therefore, it is uncertain whether *"Confirm this!"* was intended to cover the entire original paragraph or only one of the two resulting paragraphs.

**12.** Carto testified:
Q. Why did you wrote [sic] that?
A. That was because of the wording in the story, 'Hunt immediately sued for millions of dollars in damages, claiming he could prove that he had been in Washington, D.C., that day on duty at the CIA.'
Q. Is that what you wanted confirmed?
A. 'It turned out, however, that this was not true, so he said that he had been on leave and doing household errands, including a shopping trip to a grocery store in Chinatown.'
Q. What did you want confirmed?
A. Those facts.

Q. That you just read?
A. Well, that he had sued for millions of dollars in damages claiming he could prove that he had been in Washington, D C, that day.
Tr. 306. In a further attempt by Hunt's attorney to determine the precise information Carto was concerned with, the following colloquy occurred:
Q. On the bottom line as part of the information that you wanted confirmed, the original manuscript read: 'It turned out, however, that he was not,' and that was changed to: 'It turned out, however, that this was not true.' Who made that change?
A. I don't know.
Q. You did not?
A. No.
Q. Is that all you wanted confirmed?
A. As far as I recall.
Tr. 308–09.

**13.** Q. Is that what you did in this case?
A. That's what I feel like I did.
Q. Who did you call?
A. I don't remember.
Q. Do you have a note?
A. Not now.
Tr. 399.

that he also believed that he was supposed to substantiate the statement rebutting Hunt's claim that he was in Washington, D.C.[14] Later, when Hunt's attorney asked Tucker if he independently verified Hunt's "alibi" that he was at a Chinese grocery store, he replied that he believed he found the name of the shop in the Weberman and Canfield book and that after learning the name he could not find a "listing" for it. Tr. 404. After this, he stated that he was satisfied that the statement was true.

An attempt was also made to discover whether Carto and Tucker knew of Hunt's public denials of complicity in the death of the President, and, if so, whether such denials caused them any concern with regard to the publication of Marchetti's article. Carto had read Hunt's denials. When asked whether the fact that Hunt sued others who had accused him of involvement in the Kennedy assassination raised questions in his mind, Carto replied, "Well, no, because we weren't making any such accusations." Tr. 357. The only reference to Hunt's public denials during Tucker's testimony appears in the context of his confirmation of the lawsuit mentioned in the article. According to Tucker, that fact did not "overwhelm" him because people are always suing newspapers. He testified that the lawsuit "Probably made me call Victor up one more time." Tr. 403.

Another line of inquiry related to litigation between Marchetti and the CIA. Carto and Tucker were aware, prior to publication, that the CIA had obtained an injunction against Marchetti to prevent the publication of secrets he learned while with that agency, in violation of an oath of secrecy. Hunt's attorney questioned Carto and Tucker concerning the effect the injunction had on their assessment of Marchetti and his article. Carto first stated that he did not regard this development as a cause to question Marchetti's integrity—that it was "a highly political matter." Tr. 331. Later, however, he changed the tone of his response:

Q. Did that give rise to any suspicion on your part that Mr. Marchetti might have been prejudiced against the CIA in the manuscript that he submitted to you?

A. Well, he certainly was at odds with certain groups within the CIA, but by the same token he had and I assume still has friends among other groups within the CIA.

Q. That didn't make you question anything he wrote about the CIA then?

A. Oh, absolutely.

Q. It did or it did not?

A. It did.

Q. And did you question him on what he wrote?

A. Well, you can see I did question on the manuscript.

A. That does not look like me or feel like me
. . . .

. . . .

Q. Did you verify or did you confirm—I guess that's what Carto said, 'Confirm this.' Did you confirm that Howard Hunt was not in Washington, D.C that day?

A. In the same way, through Victor Marchetti's reassurance.

Q. I thought you said that you had called down to Miami in an attempt to confirm the lawsuit.

A. I was trying to confirm that he had, in fact, filed a lawsuit making that claim.

Q. And you were depending on Mr. Marchetti to say that his claim in the lawsuit was not true?

A. I didn't feel like I was really—

Tr. 400–02.

14. Q. You never doubted that there was such a lawsuit, did you?
A. Oh, no.
Q. And you never doubted the contents of the lawsuit?
A. I wasn't really too—
Q. Did Mr. Carto ask you to confirm that Hunt said in the lawsuit that he could prove where he had been in Washington, that he had been in Washington that day?
A. Oh, yes. I was glad to be able to do it because that gives a little balance to the story if Hunt says he was in Washington when other people are saying he was in Dallas, that's very significant.
Q. 'It turned out, however, that he was not.' And that was changed to, 'That this was not true.' Who changed that?

Tr. 340–41.[15] Tucker considered the injunction, but he "accepted [Marchetti's] premise that he would not reveal no [sic] information that actually—and had not—that would actually damage his own country." After explaining that most classified information has "nothing to do with national security," he said that he decided that "the CIA doesn't have too much trouble getting a court injunction." Tr. 419–20.

Another line of inquiry focused on the length of time the article remained in Liberty Lobby's possession before it was published and whether time constraints influenced the date of publication. Carto could not recall when the article was received or the relationship of the date of receipt to the deadline. He testified that they "may have had the article sitting around for weeks before we used it." Tr. 349. Tucker testified that the first time he saw the manuscript was a "few days before it was published." He also stated that "we had the copy for a few days at least, if not weeks, before we carried it in the paper. It may have been around for a while. I just don't recall." Tr. 374. Tucker did not regard the story as a "hot" item but felt that they would have been conscious of the fact that it needed to be published before the upcoming hearings—that there was a "time factor involved." Tr. 374–75. He concluded, however, that he had sufficient time to check out the story prior to publication. Tr. 421.

Another significant area covered by the depositions of Carto and Tucker dealt with the drafting of the headlines and subheadlines that appeared in the publication. The testimony and the marked-up version of the manuscript confirmed that the original title assigned by Marchetti was "The JFK Assassination: New Developments and Another Cover-Up." According to Carto, Tucker was responsible for drafting the new headlines and he did not believe that he saw them before publication. In Carto's view, the purpose of headlines is twofold: to fit a certain available space and to "get the in-

terest of the reader and relate to the contents of the story." Tr. 298.

Tucker was more expansive in his testimony. He explained that he always redrafts the headlines in articles submitted by free lancers. When asked why he chose the wording "CIA to Nail Hunt for Kennedy Killing" he answered:

Now, I considered it a flareful thing—not to say that Hunt killed Kennedy, but to say that the CIA is going to finger him or the CIA to nail Hunt for Kennedy assassination or killing, or to finger him—my own construction of it is to blame, being synonymous with to blame Hunt for it. Something of that nature.

Tr. 368. After this analysis, Tucker was asked whether he talked to anyone about the impression given by the headline. His response was:

That's an interesting question. We often do that and all newspapers do. And you don't show the guy the story, don't let him know anything about it. What does that tell you? That if somebody said to me, 'Well, the Spotlight is saying Hunt killed Kennedy' and I would say, 'Kill the headline.' Even if I could defend it in a semantic argument we are still putting the paper out for Miss Mergatroid in Timbuktu and her first reaction to the headline we want to be accurate. So in my mind and since I do it so often, I think that I probably tried it—as the paper comes together, we reset headlines at the last minute.

Well, the story is published once we pull two-page proofs, one for me and one to be circulated. And at that point in fact we tried to build in safeguards all the way down the line If the people who read these page proofs said, 'The Spotlight is accusing Hunt of killing Kennedy,' we would have made an immediate change, up until the last minute.

Tr. 369. Tucker claimed that the purpose of the headline was to attract the readers'

---

**15.** The only "question" written by Carto on the manuscript was the lone comment "*Confirm this*!"

attention and to summarize the content of the story.

Finally, Carto and Tucker each reiterated that they believed the accuracy and plausibility of the article. Tucker acknowledged that the story was "sensational," but that, largely because of Marchetti's strong credentials, he believed in its validity.

### Sufficiency of the Evidence

Liberty Lobby's challenge to the sufficiency of the evidence is restricted to the proof of actual malice, a necessary component to a successful libel action.[16] It contends that there is no evidence that it knew that the Marchetti article was false or that it entertained doubts about the truth of the matter contained therein.

In *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), the Supreme Court held that libel actions by "public officials" are limited by the first amendment and that a public official must prove that the defendant acted with "actual malice" in order to prevail in such a case. Actual malice is defined as a statement made "with knowledge that it was false or with reckless disregard of whether it was false or not." *Id.* at 279–80, 84 S.Ct. at 726, 11 L.Ed.2d at 706. Subsequently, in *Curtis Publishing Co. v. Butts* and *Associated Press v. Walker,* 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967), the Court extended the *New York Times* actual malice rule to libel actions by "public figures." The plurality opinion in *Curtis Publishing* suggested that, although public figures would be required to prove actual

malice, a public figure who is not a public official could also recover damages

> for a defamatory falsehood whose substance makes substantial danger to reputation apparent, on a showing of highly unreasonable conduct constituting an extreme departure from the standards of investigation and reporting ordinarily adhered to by responsible publishers.

*Id.* at 155, 87 S.Ct. at 1991, 18 L.Ed.2d at 1111. However, a majority of the Court did not endorse this "responsible publisher" standard and subsequent decisions confirm that public figures and public officials are governed by the same actual malice standard. *See Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974); *Ryan v. Brooks,* 634 F.2d 726, 731 (4th Cir.1980).[17]

Because he is a public figure, Hunt must prove with clear and convincing evidence that Liberty Lobby acted with actual malice. *Long v. Arcell,* 618 F.2d 1145 (5th Cir.1980), *cert. denied,* 449 U.S. 1083, 101 S.Ct. 869, 66 L.Ed.2d 808 (1981).[18] It is incumbent upon the plaintiff to establish either that the defendant in fact knew that the material was false or that it was published with reckless disregard of whether it was false or not. Moreover, "reckless disregard" is not an objective or normative standard. Rather, as the Court pointed out in *St. Amant v. Thompson,* 390 U.S. 727, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968):

> These cases are clear that reckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before

---

**16.** There is no controversy as to Hunt's proof of the remaining elements which, according to the jury instructions, included:

> First, that the defendant published written statements, as opposed to oral statements. Second, that the written statements constituted libel as that term is defined for you in these instructions. Third, that the publication was of and concerning the plaintiff. Fourth, that the publication was communicated to third persons. Fifth, that the publication was false in some material particular.

Tr. 515. During the trial, the appellant's position focused on the truth of the story and the claim that it was not damaging to Hunt. No

argument is made on appeal that the evidence was inadequate to support the jury's rejection of these defenses. *See Rogero v. Noone,* 704 F.2d 518, 520 n. 1 (11th Cir.1983); *Harris v. Plastics Manufacturing Co.,* 617 F.2d 438, 440 (5th Cir.1980).

**17.** Hunt stipulated that he is a public figure, so there is no need to delve further into that subject.

**18.** In *Bonner v. City of Prichard,* 661 F.2d 1206 (11th Cir.1981) (en banc), the Eleventh Circuit adopted as precedent the decisions of the Fifth Circuit rendered prior to October 1, 1981.

publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication. Publishing with such doubts shows reckless disregard for truth or falsity and demonstrates actual malice.

390 U.S. at 731, 88 S.Ct. at 1325, 20 L.Ed.2d at 267.

[4] This heavy burden of proof is necessary to "preserve[] the balance between free debate on the one hand and compensation of individuals for harm inflicted by defamatory falsehood on the other." *Rosanova v. Playboy Enterprises, Inc.,* 580 F.2d 859, 862 (5th Cir.1978). Consistent with the strong societal interest in preserving free debate, an appellate court is required to examine the evidence with careful scrutiny. *Long,* 618 F.2d at 1147; *Vandenburg v. Newsweek,* 507 F.2d 1024, 1026–27 (5th Cir. 1975) ("*Vandenburg II*"). "Although we are not in a position to judge the credibility of witnesses, our duty is to make an independent examination of the evidence and determine whether there was a clear and convincing showing of actual malice." *Long,* 618 F.2d at 1147.

█ Absent an admission by the defendant that he knew his material was false or that he doubted its truth, a public figure must rely upon circumstantial evidence to prove his case. *See Herbert v. Lando,* 441 U.S. 153, 99 S.Ct. 1635, 60 L.Ed.2d 115 (1979). In conducting our sufficiency review, certain principles guide our assessment of the evidence. In essence, these rules delineate the permissible inferences, in a constitutional sense, that may be drawn from a public figure plaintiff's proof.

█ It is well established that evidence that a publisher failed to investigate prior to publication does not, by itself, prove actual malice. *St. Amant,* 390 U.S. at 732–33, 88 S.Ct. at 1326, 20 L.Ed.2d at 268; *Brewer v. Memphis Publishing Co., Inc.,* 626 F.2d 1238, 1258 n. 26 (5th Cir.1980), *cert. denied,* 452 U.S. 962, 101 S.Ct. 3112, 69 L.Ed.2d 973

(1981); *Vandenburg II,* 507 F.2d at 1026; *New York Times Co. v. Connor,* 365 F.2d 567 (5th Cir.1966).[19] However, when an article is not in the category of "hot news," that is, information that must be printed immediately or it will lose its newsworthy value, "actual malice may be inferred when the investigation for a story . . . was grossly inadequate in the circumstances." *Vandenburg v. Newsweek, Inc.,* 441 F.2d 378, 380 (5th Cir.1971) ("*Vandenburg I*"), *cert. denied,* 404 U.S. 864, 92 S.Ct. 49, 30 L.Ed.2d 108 (1971), *appeal after remand,* 507 F.2d 1024, 1027 (5th Cir.1975). *See also Curtis Publishing,* 388 U.S. at 157, 87 S.Ct. at 1992, 18 L.Ed.2d at 1112; *Ryan v. Brooks,* 634 F.2d 726, 733 (4th Cir.1980).

The Supreme Court has cited certain circumstances which may support a finding of actual malice:

> The defendant in a defamation action brought by a public official cannot, however, automatically ensure a favorable verdict by testifying that he published with a belief that the statements were true. The finder of fact must determine whether the publication was indeed made in good faith. Professions of good faith will be unlikely to prove persuasive, for example, where a story is fabricated by the defendant, is the product of his imagination, or is based wholly on an unverified anonymous telephone call. Nor will they be likely to prevail when the publisher's allegations are so inherently improbable that only a reckless man would have put them in circulation. Likewise, recklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports.

*St. Amant,* 390 U.S. at 732, 88 S.Ct. at 1326, 20 L.Ed.2d at 267–68 (footnote omitted). Since *St. Amant,* several courts have held that evidence which shows that the statement was inherently implausible or that there were obvious reasons to doubt the veracity of the informant is relevant to establishing actual malice. *See, e.g., Gertz*

---

**19.** It is also clear the failure to retract or correct a falsehood does not prove actual malice. *See New York Times v. Connor,* 365 F.2d 567, 577 (5th Cir.1966).

*v. Robert Welch, Inc.,* 680 F.2d 527, 538 (7th Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 1233, 75 L.Ed.2d 467 (1983); [20] *Dickey v. CBS, Inc.,* 583 F.2d 1221, 1229 (3d Cir. 1978); *Hotchner v. Castillo-Puche,* 551 F.2d 910, 913–14 (2d Cir.1977) *cert. denied,* 434 U.S. 834, 98 S.Ct. 120, 54 L.Ed.2d 95 (1977). "[A] publisher cannot feign ignorance or profess good faith when there are clear indications present which bring into question the truth or falsity of defamatory statements." *Gertz,* 680 F.2d at 538 (quoted in *Fitzgerald v. Penthouse International, Ltd.,* 691 F.2d 666, 670 (4th Cir.1982)).

■ Our examination of the appellate court opinions also reveals that actual malice may be inferred in another circumstance in which the defendant protests his innocence. In *Buckley v. Littell,* 539 F.2d 882 (2d Cir.1976), *cert. denied,* 429 U.S. 1062, 97 S.Ct. 785, 50 L.Ed.2d 777 (1977), the author published a statement to the effect that William F. Buckley could be sued for libel. At the trial, the author suggested that he did not intend to label Buckley a libeler— that his metaphor was meant only to criticize Buckley's "hounding" of certain people.[21] The Second Circuit upheld a finding of actual malice, reasoning that the clear meaning to be inferred from the publication was that the author accused Buckley of making libelous statements. *Id.* at 896. Thus, the trial court was free to reject the author's assertion that he did not intend the statement to be interpreted in that manner. Similarly, in *Montandon v. Triangle Publications, Inc.,* 45 Cal.App.3d 938, 120 Cal. Rptr. 186, *cert. denied,* 423 U.S. 893, 96 S.Ct. 193, 46 L.Ed.2d 126 (1975), the California appellate court found that actual malice had been established when the defendant published an article containing a defamato-ry statement, even though the publisher testified that he did not interpret it in that manner. The defendants in *Montandon* edited a press release for a television show on which the plaintiff was scheduled to appear. The description of the upcoming program circulated in the press release originally stated: "FRIDAY, SEPTEMBER 20TH, 10:30 P.M., PAT MICHAELS SHOW, FROM PARTY–GIRL TO CALL–GIRL? How far can the 'party-girl' go until she becomes a 'call-girl' is discussed with T–V personality Pat Montandon, author ('How to be a Party-Girl') and a masked-anonymous prostitute!" After the defendants edited this report, the following excerpt was printed in the TV Guide: "Pat Michaels— Discussion, 'From Party Girl to Call Girl.' Scheduled guest: TV Personality Pat Montandon and author of 'How to Be a Party Girl.'" 45 Cal.App.3d at 942–43, 120 Cal. Rptr. at 188. The defendants claimed that they did not believe that the program note labeled Ms. Montandon a call girl. The court affirmed a finding of actual malice, stating:

> This testimony flies in the face of reason, as a reading of the program note reveals
>
> The action by the TV Guide staff showed a reckless disregard of whether the statement published was true or false, because the staff was aware that the true facts, as stated in the press release, were that Pat Montandon was not a call girl but would be appearing on a show with a call girl; and a staff decision was made to leave out crucial facts in rewriting the release, thereby implying that plaintiff was a call girl. This is proof of convincing clarity to support the jury's verdict that the article was published not in good faith, but with actual malice.

---

**20.** This *Gertz* opinion is the appeal after a retrial following a remand from the Supreme Court. The Supreme Court held that *Gertz* was not a public figure, *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), and therefore, did not have to show actual malice. However, because of a state law privilege, he was nevertheless required to prove actual malice. Accordingly, the Seventh Circuit reviewed the evidence under the *New York Times* criterion.

**21.** The excerpt from the defendant's book stated: " 'Like Westbrook Pegler, who lied day after day in his column about Quentin Reynolds and goaded him into a lawsuit, Buckley could be taken to court by any one of several people who had enough money to hire competent legal counsel and nothing else to do.' " 539 F.2d at 895.

*Id.* 45 Cal.App.3d at 943–44, 120 Cal.Rptr. at 189. Under the *Montandon* decision, an inference of actual malice can be drawn when a defendant publishes a defamatory statement that contradicts information known to him, even when the defendant testifies that he believed that the statement was not defamatory and was consistent with the facts within his knowledge.[22]

▇ With these principles in mind, we conclude that Hunt met his burden of proving with convincing clarity that Liberty Lobby published the article with actual malice. The jury found that the article was both libelous and false and Liberty Lobby does not challenge that determination.[23] Thus, assuming the falsity of the article, we turn to the evidence before the jury that the appellant knew it was false or entertained serious doubts about its truth.

▇ First, there is evidence that Liberty Lobby had reason to, and in fact did, question Marchetti's neutrality in reporting on CIA matters. The article disclosed a CIA scheme to mislead Congress and the American public apparently to cover up the role that it purportedly played in the assassination of President Kennedy. Needless to say, it displayed a highly inflammatory opinion of the agency. Carto testified that he knew Marchetti had been involved in litigation with the CIA and that fact "absolutely" caused him to question what Marchetti wrote about the CIA. This evidence provides a clear and compelling inference that Liberty Lobby had "obvious reasons to doubt the veracity of the informant or the accuracy of his reports." *St. Amant,* 390 U.S. at 732, 88 S.Ct. at 1326, 20 L.Ed.2d at 268. *See also, Gertz,* 680 F.2d at 538. Although Carto said he did question Marchetti "on the manuscript," the only reference

thereto was the notation *"Confirm this!"* That remark apparently referred to Hunt's lawsuit against the authors of "Coup d'etat in America" concerning his "alibi." Thus, the jury could reasonably conclude that Carto did not follow up on his doubts about Marchetti's neutrality prior to publication.

Furthermore, it is clear that the article was not "hot news." Neither Carto nor Tucker could remember when the article was received, but Tucker did not regard it as a "hot" item and had sufficient time to check it out before publication. While Marchetti's undisclosed sources would have been difficult if not impossible to verify, other information contained in the article was capable of confirmation. Liberty Lobby only sought confirmation of the details of Hunt's lawsuit and the "truth" of his "alibi." Carto obviously had a question about Marchetti's information. However, he could not remember what, if anything, Tucker found out, although he said he was satisfied that "it was true." Tucker was equally ambiguous, indicating that he might have called a newspaper in the city in which the action was pending (although he never states affirmatively that he did so), or that he asked Marchetti about it, or that he looked in the telephone book to see if the Chinese grocery where Hunt allegedly said he was shopping in 1963 existed in 1978.[24] When a story is not "hot news," "actual malice may be inferred when the investigation … was grossly inadequate in the circumstances." *Vandenburg I,* 441 F.2d at 380. We believe that the jury could properly decide that Liberty Lobby's "investigation" did not pass muster and, accordingly, infer actual malice therefrom.

Next, the jury could have also inferred actual malice from the inherent improbabil-

**22.** This inference is in harmony with the language in *St. Amant.* A defamation defendant cannot automatically insure a favorable verdict by claiming that he believed his statements were true or that he did not interpret his writing as defamatory.

**23.** *See* note 16 *supra.*

**24.** The record is unclear concerning the details of the lawsuit and Hunt's claims therein. How-

ever, Hunt's unrebutted testimony indicates that Marchetti's description was false. *See* Tr. 243–46. It appears that neither Tucker nor Carto actually saw any court pleadings in that case. Although such investigation might not ordinarily be required, when a publisher indicates that he has a question about a lawsuit, as here, it is not unreasonable to require a satisfactory answer to that line of inquiry prior to publication of libelous materials.

ity of the story. *St. Amant,* 390 U.S. at 732, 88 S.Ct. at 1326, 20 L.Ed.2d at 268. Of course, Carto and Tucker said they believed the information was plausible. However, the jury was under no obligation to credit this testimony. *Id.* The jury certainly could have determined that "only a reckless man" would circulate a story announcing that the CIA was going to cover up its role in the Kennedy murder by admitting that E. Howard Hunt was involved without official permission. Contrary to the appellant's assertion, Hunt's testimony that he thought the story could be true does not negate the inference to be drawn from inherent improbability. We firmly believe that even if Hunt thought the CIA might engage in such conduct, a jury could constitutionally view the story as inherently improbable.

■ Finally, we think that the jury could infer actual malice from the headlines. The original title submitted by Marchetti was "The JFK Assassination: New Developments and Another Coverup." Tucker substituted the following headlines and subheadlines: "CIA to Nail Hunt for Kennedy Killing," "CIA to 'Admit' Hunt Involvement in Kennedy Slaying," "They'll Hang Hunt," "Posing as a Bum." According to Tucker, he thought the choice of headlines in this instance was a "flareful thing" and he would have "killed" the headlines if anyone told him that the Spotlight was saying "Hunt killed Kennedy." Carto and Tucker each professed to believe that the headlines conveyed the contents of the story. Tucker's stated purpose in redrafting the headlines was to explain that the CIA was going to "blame" Hunt for the murder.

Although Liberty Lobby insists that the headlines were only meant to reveal a plan to falsely accuse or frame Hunt, it is obvious that the headlines could have conveyed the impression to a fact finder that Hunt was involved in the assassination. Viewing the headlines alone, the jury could have reasonably found that the Spotlight simply was reporting a truthful accusation by a federal government agency. Tucker's reference to the headlines as a "flareful

thing," indicates, contrary to his testimony, that he knowingly chose language that was subject to a false and highly defamatory interpretation. Under these circumstances, a finding of actual malice is constitutionally permissible. *Cf. Buckley,* 539 F.2d at 896; *Montandon,* 45 Cal.App.3d at 934–44, 120 Cal.Rptr. at 189.

The sum total of the inferences of actual malice properly drawn from Hunt's proof constitutes clear and convincing evidence to support the jury's determination. The jury simply was not required to believe the appellant's professions of good faith. Hunt successfully compiled enough evidence to satisfy the constitutional restrictions placed upon public figures in libel litigation. We are conscious of the relatively high standard of proof required in such cases, but a jury verdict based on evidence which satisfies that burden can, and should, withstand strict appellate review.

### Jury Instructions

The appellant assigns as error the district court's instructions to the jury on actual malice, punitive damages and respondeat superior.

### A. *Responsible Publisher Instruction.*

[11] After the district judge instructed the jury on Hunt's burden to prove actual malice by clear and convincing evidence, he stated:

A public figure may recover damages for a defamatory falsehood whose substance makes substantial danger to reputation apparent on a showing of highly unreasonable conduct constituting an extreme departure from the standards of investigating and reporting ordinarily adhered to by responsible publishers.

Tr. 515. Liberty Lobby did not object to this instruction. Elsewhere in the court's charge, appears a more detailed explanation of the proof of actual malice. In that portion, no reference was made to the standards ordinarily adhered to by responsible publishers.

The appellant maintains that this "responsible publisher" charge permits recov-

ery by a public figure based on an insufficient showing of actual malice. The instruction was requested by Hunt with a citation to *Curtis Publishing Co. v. Butts,* 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967). In *Curtis Publishing,* Justice Harlan's plurality opinion contained that language as a suggested standard for public figure, as opposed to public official, cases. However, a majority of the court in *Curtis Publishing* did not endorse this instruction. Four justices concurred in Chief Justice Warren's separate opinion which rejected the responsible publisher standard, holding that public figures must make the same showing as public officials—proof that the publisher in fact knew the material was false or that he in fact entertained serious doubts as to its truth. The cases since *Curtis Publishing* have disapproved an objective standard such as that suggested by Justice Harlan and given in this case. *See, e.g., Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974); *Long v. Arcell,* 618 F.2d 1145 (5th Cir.1980), *cert. denied,* 449 U.S. 1083, 101 S.Ct. 869, 66 L.Ed.2d 808 (1981); *Ryan v. Brooks,* 634 F.2d 726, 731 (4th Cir.1980). "The test of actual malice is not whether the defendant acted as a reasonable publisher would have acted under the circumstances. Rather, the inquiry focuses on the defendant's state of mind at the time of publication." *Long,* 618 F.2d 1147.

Thus, it is clear to us that the instruction taken from the *Curtis Publishing* plurality opinion was error. In spite of this infirmity, Liberty Lobby did not object to it as required by Rule 51 of the Fed.R.Civ.P.[25] A remand for a new trial is necessary only if the error is so fundamental that the failure to recognize it will result in a miscarriage of justice. *See Barnett v. Housing Authority of the City of Atlanta,* 707 F.2d 1571 at 1580 (11th Cir.1983); *Patton v. Archer,* 590 F.2d 1319, 1322 (5th Cir.1979);

*Delancey v. Motichek Towing Service, Inc.,* 427 F.2d 897, 901 (5th Cir.1970).

Although the jury instructions in this case did contain the proper subjective guidelines for recovery by a public figure, they also authorized the jury to find liability based upon an improper objective standard. Much of Hunt's evidence centered on whether the appellant's conduct was unreasonable. Indeed, Hunt's opinion that, based upon his experience as a journalist, the appellant's actions were irresponsible was admitted into evidence. Based on this record, the jury could have imposed liability because it found that the appellant engaged in "highly unreasonable conduct constituting an extreme departure from the standards of investigating and reporting ordinarily adhered to by responsible publishers," or it could have found that the appellant knew that the article was false or had serious doubts about its truth. We have no way of knowing the premise for this judgment. The Supreme Court has repeatedly cautioned that the preservation of the freedom of the press requires public figures and public officials to prove subjective actual malice. *See, e.g., Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974); *St. Amant v. Thompson,* 390 U.S. 727, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968). Because we do not know whether the jury followed the constitutionally mandated criteria, a new trial will be necessary. *See Somer v. Johnson,* 704 F.2d 1473, 1478 (11th Cir.1983) (new trial is required when both proper and improper instructions given because jury could have followed incorrect rule); *Johnson v. Bryant,* 671 F.2d 1276, 1281 (11th Cir.1982). *Cf. Time, Inc. v. Hill,* 385 U.S. 374, 87 S.Ct. 534, 17 L.Ed.2d 456 (1967) (new trial mandated when jury charges permitted recovery based upon, *inter alia,* the failure to make a reasonable investigation, even though instructions ar-

25. At the close of the evidence or at such earlier time during the trial as the court reasonably directs, any party may file written requests that the court instruct the jury on the law as set forth in the requests .... No party may assign as error the giving or the failure to give an instruction unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection .... Fed.R.Civ.P. 51.

guably included the *New York Times* actual malice rule).

## B. *Respondeat Superior Liability.*[26]

■ The appellant also contends that the trial court erred in its instruction on respondeat superior liability. While the appellant concedes that it is vicariously liable for the actions of Carto and Tucker, it vigorously argues that it cannot be held accountable for Marchetti's conduct. In essence, it claims that Marchetti's *state of mind,* for the purpose of finding actual malice, may not be imputed to the publisher because Marchetti was an independent contractor.

The district court charged the jury as follows:

> When a corporation is involved, of course, it may act only through natural persons as its agents or employees, and in general any agent or employee of a corporation may bind the corporation by his acts and declarations made while acting within the scope of his authority delegated to him by the corporation, or within the scope of his duties as an employee of the corporation.
>
> . . . .
>
> The court now instructs you that publishers can be held vicariously liable for knowing falsehood offered by freelance writers.
>
> An act of an employee or agent, to become the act of Liberty Lobby, Inc., must be performed by the agent, while acting within the scope of his employment.

> The court charges you as a matter of law, that before any acts of knowledge of Victor Marchetti or James P. Tucker may be imputed to the defendant, Liberty Lobby, Inc., plaintiff, must prove by a preponderance of the evidence that the defendant, Liberty Lobby, Inc., had actual knowledge of its facts and information, or that Marchetti and Tucker were acting in the scope of their employment when they performed the acts or required the information.

Tr. 509–511.

Liberty Lobby made only a general, ambiguous objection to this instruction, stating that "[t]here is no question we would be liable for anything Mr. Tucker might have done. He is sort of lumped in here where it says freelance writer and what-have-you." Tr. 463. We seriously doubt that this objection constituted a distinct statement of the matter to which the appellant objected and the grounds for its objection, *see* Fed.R. Civ.P. 51. It does not even raise the question of vicarious liability for Marchetti's actions. Nevertheless, because a new trial is required, we consider the appellant's current objection to the jury charge.

In *Cantrell v. Forest City Publishing Co.,* 419 U.S. 245, 95 S.Ct. 465, 42 L.Ed.2d 419 (1974), the Court approved of a jury charge which permitted the imposition of vicarious liability upon a publisher for the knowing falsehoods written by its *staff writer.* The Court found no fault with the traditional state law doctrine of respondeat superior in that context.[27] Here, it is conceded that

---

**26.** Our holding that a new trial is mandated because of the inclusion of the responsible publisher charge renders unnecessary an examination of the other assignments of error. However, we address these remaining points briefly in an effort to facilitate the eventual resolution of this dispute.

**27.** In *Cantrell,* a "false-light" invasion of privacy case, the Court determined that it would be proper to hold the defendant publisher vicariously liable for a feature story written by its staff writer which contained false and fabricated information. The author of the article in *Cantrell* did not testify. Nonetheless, it was plain that the writer must have known the statements were false—he described the appearance of the plaintiff in his article and at-

tributed statements to her even though she had not been present during his visit to her home.

The district court in *Cantrell* gave the following instruction concerning vicarious liability:

> Any act of an employee or agent, to become the act of the corporation, must be performed by the employee while acting within the scope of his employment.
>
> . . . .
>
> The court charges you as a matter of law that before any acts or knowledge of Joseph Eszterhas [the staff writer] or Richard T. Conway [the photographer] may be imputed to the defendant, Forest City Publishing Company, the plaintiffs must prove by a preponderance of the evidence that defendant . . . had actual knowledge of those acts and

Carto and Tucker's actual malice could be imputed to Liberty Lobby. Their roles with the newspaper enabled them to bind the appellant by their actions. To the extent that the vicarious liability instruction respecting Tucker tracks the charge in *Cantrell*, it is sufficient.[28]

The inclusion of Marchetti in the respondeat superior instruction was not consistent with the evidence. Under Florida law, a principal is liable for the torts of his agents. *Nelson v. Shell Oil Co.,* 396 So.2d 752 (Fla. App.1981); *King v. Young,* 107 So.2d 751 (Fla.App.1958). The test for imposing such vicarious liability is whether the agent or employee is subject to the control of his principal or employer. *Id.* Conversely, it is well established that an employer is not responsible for the torts of an "independent contractor." The "status of an independent contractor, as distinguished from that of an agent, consists of a contractual relationship by one with another to perform something for him, but the one so engaged is not controlled or subject to the control of the

other in the performance of the engagement . . . ." *King,* 107 So.2d at 753.

In his amended complaint, Hunt alleged that "Marchetti is a citizen of the state of Virginia and is an independent contractor and freelance writer."[29] Consistent with this position, he did not attempt to prove his case on a vicarious liability theory as it pertained to Marchetti. His evidence focused on Carto and Tucker's actions in an effort to establish their actual malice imputable to the appellant. The record does not support a finding that the appellant controlled Marchetti in any manner.[30] Rather, from our reading of the record, it appears that the parties assumed that Marchetti was an independent contractor. Consequently, it was error to include Marchetti in an instruction on vicarious liability.[31]

### C. *Punitive Damages.*

The district court instructed the jury that it could also award punitive damages if it found in favor of Hunt on his libel cause of action.[32] The court went on to explain that

---

information or that Conway and Eszterhas were acting within the scope of their employment when they performed the acts or acquired the information.
419 U.S. at 253 n. 6, 95 S.Ct. at 471 n. 6, 42 L.Ed.2d at 428 n. 6.

**28.** We note that the district judge clearly intended to adopt the language approved in *Cantrell* but that, apparently due to inadvertence, certain words were misquoted or, possibly, improperly transcribed. (Compare jury charge quoted at page 36 with instruction from *Cantrell* quoted in note 27 *supra*). The charge contained in the record in this case is confusing. We are confident, though, that this deficiency will be cured in a new trial.

**29.** We note that this judicial admission in a pleading is binding on Hunt, *see Hill v. FTC,* 124 F.2d 104, 106 (5th Cir.1941), although we do not rely upon that ground in finding the instruction erroneous.

**30.** Marchetti was not solicited to write an article on the topic and his research was not directed by anyone at the Spotlight. He merely sold a finished product to the appellant. *Cf. Gertz v. Robert Welch, Inc.,* 680 F.2d 527, 539 n. 19 (7th Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 1233, 75 L.Ed.2d 467 (1983) (vicarious liability justified when publisher selected the

topic and solicited the freelance writer, provided background materials and kept in constant contact with the author while he was preparing the article).

**31.** We make no judgment concerning whether the charge as it concerned Marchetti amounted to plain error. Of course, vicarious liability for Marchetti's torts is not necessary to a recovery against Liberty Lobby. There was sufficient evidence to find that Carto and Tucker *published* the article with actual malice which would justify a verdict against the appellant.

**32.** The district judge charged:
If you find for Howard Hunt, you may, in your discretion, assess punitive damages against Liberty Lobby as punishment and a deterrent to others.
If you find that punitive damages should be assessed . . . you may consider the financial resources of Liberty Lobby in fixing the amount of such damages.
As I stated, the plaintiff claims that the acts of the defendants were done wilfully, intentionally or with callous and reckless indifference to plaintiff's rights, so as to entitle him to an award of punitive damages, in addition to compensatory damages.
If you find for plaintiff, and if you further find that any defendant did act with malice, wilfullness or callous and reckless indiffer-

**650**

such damages would be proper if the jury determined that Liberty Lobby acted with "malice, wilfullness or callous and reckless indifference" to Hunt's rights. Although the appellant did not object to this jury charge at the trial, it now complains that it was an incorrect statement of Florida law. Alternatively, it argues that punitive damages cannot be constitutionally imposed in public figure libel cases.[33]

■ In *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), the Court held that a non-public figure could recover compensatory damages for libel without showing *New York Times* actual malice as long as he proved some degree of fault. However, the Court decided, such a person cannot recover *punitive* damages without demonstrating actual malice—"the States may not permit recovery of ... punitive damages ... when liability is not based on a showing of knowledge of falsity or reckless disregard for the truth." *Id.* at 349, 94 S.Ct. at 3011, 41 L.Ed.2d at 810. After *Gertz* there was some speculation that punitive damages could not be recovered by public figures because of the Court's clear aversion to such a penalty in first amendment cases. Nevertheless, as many courts have recognized, *Gertz* did not go that far. *See, e.g., Maheu v. Hughes Tool Co.*, 569 F.2d 459, 478–80 (9th Cir. 1977); *Appleyard v. Transamerican Press, Inc.*, 539 F.2d 1026, 1029–30 (4th Cir.1976), *cert. denied*, 429 U.S. 1041, 97 S.Ct. 740, 50 L.Ed.2d 753 (1977); *Carson v. Allied News Co.*, 529 F.2d 206, 214 (7th Cir.1976); *Davis v. Schuchat*, 510 F.2d 731, 736–38 (D.C.Cir. 1975). Rather, punitive damages can be

recovered consistently with the first amendment by public figures who are able to prove *New York Times* actual malice. *Id.* We decline to adopt a contrary view.[34]

■ The determination that punitive damages are available to a public figure in a constitutional sense does not end our inquiry. The states are free to impose an additional burden upon plaintiffs who seek punitive damages in libel actions. *See Cantrell v. Forest City Publishing Co.*, 419 U.S. 245, 95 S.Ct. 465, 42 L.Ed.2d 419 (1974). Many states do not permit punitive damages unless the plaintiff can show that the defendant entertained "common law" or "express" malice. Common law malice differs substantially from the *New York Times* definition of actual malice. The former focuses on the defendant's feelings toward the plaintiff while the latter goes to the defendant's knowledge of the truth or falsity of a publication about the plaintiff. *Cantrell*, 419 U.S. at 251–52, 95 S.Ct. at 469–70, 42 L.Ed.2d at 426–27.

Our research confirms that Florida is one of those states that requires a form of common law malice to sustain an award for punitive damages. The Florida courts have concluded that "In order to award punitive damages in a libel action, ill will, hostility or an evil intention to defame and injure, must be present." *Matthews v. Deland State Bank*, 334 So.2d 164, 166 (Fla.App. 1976). *See also, Brown v. Fawcett Publications, Inc.*, 196 So.2d 465, 472–73 (Fla.App.), *cert. denied*, 201 So.2d 557 (Fla.1967). While the Florida law is not without ambi-

---

ence to the rights of others, the law would allow you, in your discretion, to assess punitive damages against such defendant as punishment and as a deterrent to others.

**33.** The American Civil Liberties Union of Florida and American Civil Liberties Union Fund of the National Capital Area as *amici curiae* also propose this alternative holding.

**34.** Although public figures may recover punitive damages, we note that because of the threat to first amendment freedoms posed by excessive punitive damages awards, district courts should give careful attention to excessive awards. In *Curtis Publishing Co. v. Butts*,

388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967), the Harlan plurality opinion stated:

> We think the constitutional guarantee of freedom of speech and press is adequately served by judicial control over excessive jury verdicts, manifested in this instance by the trial court's remittitur, and by the general rule that a verdict based on jury prejudice cannot be sustained even when punitive damages are warranted.

*Id.* at 160, 87 S.Ct. at 1994, 18 L.Ed.2d at 1114. While we do not evaluate the magnitude of the punitive damages in this case, it should be a matter of concern to the district court on retrial in light of the plurality opinion in *Curtis Publishing*.

guity, it appears that proof of this type of malice may come from two sources: the publication itself and extrinsic evidence concerning the defendant's feelings toward the plaintiff. *Id.* Therefore, a jury instruction on the common law malice necessary to support punitive damages should focus the jury's attention on the defendant's feelings of ill will toward the plaintiff, considering "the evidence produced at trial" and the "character of the publication itself." *Matthews,* 334 So.2d at 166.[35]

Punitive damages were predicated on the proof that Liberty Lobby acted with "malice, wilfullness or callous and reckless indifference" to the rights of Hunt. Although the instruction of the district court approaches Florida's common law malice definition, on retrial the jury should be cautioned that a verdict for punitive damages can be returned only if it finds that Liberty Lobby acted with the type of ill will identified in *Matthews.*[36]

### The Affidavits

■ Finally, Liberty Lobby complains of the admission into evidence of the affidavits of certain CIA officials. The affiant in each document stated that he was the custodian of particular records at the CIA and that, after diligent search of the appropriate files, he was unable to locate any evidence of CIA memoranda indicating that Hunt was in Dallas, Texas, on November 22, 1963 or discussing the need to explain Hunt's whereabouts on that date. The certificate of the General Counsel of the CIA

was attached to each affidavit certifying that each affiant occupied the position stated in his affidavit. These certificates bore the CIA's official seal.

■ The affidavits were properly admitted. They fell within an exception to the hearsay rule, *see* Fed.R.Evid. 803(10) ("absence of public record or entry"), and were self-authenticating, *see* Fed.R.Evid. 902(2) ("Domestic public documents not under seal"). Moreover, contrary to the appellant's contention, this evidence was relevant. One element of Hunt's case required him to prove the falsity of the published statements. Thus, he introduced the affidavits to show that the CIA memorandum referred to in the article did not exist. The argument that the absence of the memorandum at the time of the litigation does not prove its absence in 1978 should have been made to the jury. It is not a reason for exclusion of clearly relevant evidence.[37]

The judgment of the district court is AFFIRMED in part and REVERSED in part and REMANDED for a new trial.

KRAVITCH, Circuit Judge, dissenting:

I respectfully dissent from the majority's holding that the district court's jury instructions require the granting of a new trial. Although I agree that the instruction referring to the standards of responsible publishers is legally incorrect, I do not believe that in light of Liberty Lobby's failure to object to the instruction at trial it amounts to reversible error.

Fed.R.Civ.P. 51 states that:

---

**35.** No exhaustive discussion of the proof of common law malice is required in light of the fact that our comments on the punitive damages issue are not necessary to the disposition of this appeal. We only intend to point out the desirability of fashioning an appropriate jury charge which comports with the Florida case law.

**36.** Of course, there can be no punitive damages unless there is first a finding of actual malice as defined in *New York Times.* The better practice would be to repeat this admonition so as to foreclose the possibility that the jury might award punitive damages without first finding *New York Times* actual malice. *Appleyard,* 539 F.2d at 1031 (Butzner, J., concurring).

**37.** The claim of improper jurisdiction has not escaped our attention. It is clear that Liberty Lobby is a newspaper aimed at a national audience as opposed to a regional readership, and may be required to defend this action in the Southern District of Florida. *See, Appleyard,* 539 F.2d at 1028–29; *Curtis Publishing Co. v. Golino,* 383 F.2d 586 (5th Cir.1967). The record evidence of the appellant's activities and subscription percentages in Florida adequately supports jurisdiction of the parties in the Florida district court. *Cf. Cox Enterprises, Inc. v. Holt,* 678 F.2d 936 (11th Cir.1982), *modified,* 691 F.2d 989 (11th Cir.1982).

No party may assign as error the giving or the failure to give an instruction unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection. . . .

This circuit has strictly limited the creation of exceptions to the rule: "It is true that even absent [an] objection [pursuant to F.R. Civ.P. 51] 'an appellate court will notice error so fundamental as to result in a miscarriage of justice,' but 'that power will only be exercised in exceptional cases.'" *Patton v. Archer*, 590 F.2d 1319, 1322 (5th Cir.1979) (quoting, *Delancey v. Motichek Towing Service, Inc.*, 427 F.2d 897, 901 (5th Cir.1970)).[1] *See also, Barnett v. Housing Authority of City of Atlanta*, 707 F.2d 1571, 1580 (11th Cir.1983). To determine if the challenged instruction resulted in a miscarriage of justice, we must "consider the charge as a whole from the standpoint of the jury, in view of the allegations made, the evidence presented and the arguments of counsel." *Miller v. Universal City Studios, Inc.*, 650 F.2d 1365 (5th Cir.1981).

I am not convinced upon reviewing the jury instructions and counsels' arguments that this is an "exceptional case" to be exempted from Rule 51's stringent requirements. The disputed instruction was briefly stated only once during the entire charge. More importantly, it was immediately followed by a detailed explanation of the specific elements that the plaintiff had to prove, one of which was actual malice. The judge properly instructed at length what constituted actual malice, emphasizing the importance of the publisher's mental state and cautioning that negligent failure to investigate or verify information was insufficient by itself to establish malice. Moreover, both plaintiff and defendant's counsel relied on the proper legal definition of actual malice in their closing arguments, stressing the relevancy of the publisher's mental state.[2] *Compare, Miller v. Universal City Studios, Inc., supra* (plaintiff's counsel argued faulty instruction to the jury as "the heart" of his case).

The responsible publisher instruction standing alone might have led the jury to believe that the defendant's state of mind was irrelevant. A review of the entire charge, however, with its subsequent emphasis on the publisher's mental state and its detailed explanation of actual malice does not create such "a substantial and ineradicable doubt as to whether the jury was properly guided in its deliberations," *Miller v. Universal City Studios, supra* at 1372, that the inclusion of the challenged instruction can be said to have constituted fundamental error. *See Barnett v. Housing Authority City of Atlanta, supra;* F.R. Civ.P. 51.[3] Accordingly, I would affirm the district court's judgment.

1. This court has adopted as binding precedent Fifth Circuit cases decided prior to October 1, 1981. *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir.1981) (en banc).

2. The defendant's attorney at several points during his closing argument stressed the importance of the defendant's mental state, telling the jury that "[t]he question is what was in the mind of the author and publisher when they printed the article." Similarly, the plaintiff's attorney in rebuttal focused on how they had demonstrated that the defendant had acted either with knowledge that the article was false or with reckless disregard of its truthfulness, noting that "actual malice, according to the law, refers to the mental state of Liberty Lobby . . . ." Neither closing argument suggested that the defendant's mental state was irrelevant to a finding of actual malice.

3. I express no opinion as to whether the challenged instruction would warrant reversal if Liberty Lobby had properly objected to it at trial. It is important to note, however, the special danger of granting new trials in cases where no objection to an erroneous instruction was made at trial: a party can place itself in a "no-lose" situation of either receiving a favorable verdict or, if the outcome is unfavorable, obtaining a new trial on appeal.